**In re KENNY KAR LEASING, INC.**

**Bankruptcy No. 80–06281–RO.**

United States Bankruptcy Court,
C. D. California.

July 23, 1980.

Marc A. Levinson, Richard M. Pachulski, Sidley & Austin, Los Angeles, Cal., for Crocker Nat. Bank.

Stephen A. White, Downs, Oberg & White, La Verne, Cal., for debtor Kenny Kar Leasing Co.

James T. Eichstaedt, U. S. Trustee; Joseph C. Karol, Asst. U. S. Trustee, Los Angeles, Cal.

## MEMORANDUM OPINION IN RE MOTIONS TO USE CASH COLLATERAL AND FOR ADEQUATE PROTECTION

ROBERT L. ORDIN, Bankruptcy Judge.

On July 1, 1980, Kenny Kar Leasing (hereinafter referred to as "Kenny"), filed a proceeding under Chapter 11 (11 U.S.C. § 1101 et seq.). Kenny is engaged in leasing motor vehicles; it acquires vehicles by purchase and leases these vehicles to members of the public. Its business operation is financed by arrangements with two banks—Union Bank (by agreement entered into August 2, 1976) and Crocker Bank (by

agreement entered into March 1, 1978). Kenny's obligations to Crocker are guaranteed by William and Flota Urbano.

Kenny's arrangements with Crocker may be summarized as follows:

(a) Vehicles are purchased by Kenny with the use of funds borrowed from Crocker;

(b) Kenny leases these vehicles;

(c) The leases and all payments thereunder are pledged to Crocker to secure repayment of its loans to Crocker. All of the debts to Crocker are cross-collateralized; that is to say, the vehicles and leases in each instance are all collateral for the payment of all monies advanced by Crocker;

(d) The aggregate monthly payment of principal and interest which Kenny is required to make to Crocker is $41,-000.

Kenny made similar arrangements with Union Bank. Its obligation to Union Bank each month is approximately $16,000.

On July 1, 1980, when the Chapter 11 was filed, Kenny was indebted to Crocker in an aggregate sum in excess of $1,300,000, and to Union Bank in excess of $280,000. On July 11, 1980, Crocker sought an order on notice to Kenny prohibiting Kenny from utilizing any cash collateral in which Crocker asserted an interest, i. e., the payments received on leases of vehicles financed through Crocker. Responsive to that request, this Court on July 11 conducted a hearing, at the conclusion of which an order was filed and entered. That order:

(a) prohibited Kenny from utilizing any cash collateral in which Crocker asserted an interest; and

(b) required that Kenny forthwith file an accounting of all such cash collateral received by Kenny on or after July 1, 1980; and

(c) required Kenny to appear on July 21, 1980 at 10:00 a. m. with its counsel and responsible officers of the debtor and (i) produce at that time books, records, and data which would enable Kenny to account for cash collateral in which Crocker asserted an interest and which was received by Kenny on or after July 1, 1980; and (ii) account for all funds expended by Kenny in its business operation since July 1, 1980; and (iii) offer a projection of its operating costs and expenses during the Chapter 11; and (iv) establish the source of funds upon which Kenny relied to pay its operating expenses during the Chapter 11.

Thereafter, the following motions were filed and set for hearing on July 21, 1980, at 10:00 a. m.:

(a) Kenny filed a motion to dissolve the order prohibiting its use of cash collateral and seeking the right to use such cash collateral;

(b) Crocker filed a motion to prohibit the use, sale, or lease by Kenny of motor vehicles financed through Crocker, unless adequate protection was provided to Crocker;

(c) The United States Trustee moved for the appointment of a trustee under § 151104(a). Union Bank and Crocker supported this motion.

A hearing was held on July 21, 1980 on these motions and on the matters referred to in the order of July 11, 1980. At the conclusion of the hearing, the motion of the U. S. Trustee for appointment of a trustee was continued to July 29, 1980 at 2:00 p. m. This opinion deals with the balance of the issues presented at that hearing.

Kenny insists that its rights to use cash collateral and to use, sell, or lease the inventory of vehicles financed by Crocker are mandated by the fact that the obligations to Crocker are fully guaranteed by Urbano. Further, Kenny asserts that this guaranty is tantamount to and should be treated as "an additional or replacement lien" under § 361(2), and "will result in the realization by" the bank "of the indubitable equivalent" of the bank's interest in its collateral, under § 361(3).

The bank disputes both assertions and argues that the written guaranty is not and cannot be considered to be a "lien" or its

equivalent, and that "the indubitable equivalent" in § 361(3) refers to realizable value in a context other than the collection potential afforded by an agreement of guarantee.

If the debtor is correct in the treatment to be accorded a guaranty under these circumstances, the guaranty may well constitute adequate protection; and to the extent that such adequate protection is equal to or exceeds the decrease in the value of the bank's interest in its collateral (including the cash collateral), the debtor may be entitled to use the cash collateral and to use, sell, or lease the non-cash collateral, i. e., the vehicles.

Testimony was received on behalf of the debtor from Margolis, a certified public accountant; Frances Severson, the bookkeeper for Kenny; and Kenneth Severson, the chief operating officer of the company.

The evidence reflected the following: (i) Kenny's monthly operating expenses approximate $5500. (ii) Kenny's only source of funds to defray these monthly operating expenses are the monies received from lease payments on vehicles financed by Crocker and Union. Kenny has no other significant source of income. (iii) The aggregate of principal and interest payments required to be made to Crocker and Union is $57,000 each month. (iv) During the period February 1, 1980 to May 31, 1980, Kenny's monthly income from all sources, including leases, did not exceed $54,000 per month. Its income during June was $47,000. (v) The only evidence relating to the assets or liabilities of William and Flota Urbano (hereinafter referred to as "guarantors"), was a "Statement of Assets and Liabilities" dated December 31, 1979, and the testimony of Margolis, the CPA who prepared this Statement. The guarantors have not appeared in the case, nor has any lawyer representing the guarantors filed any documents in the case, or otherwise appeared. The guaranty is appended to the moving papers filed by Kenny seeking to dissolve the order of July 11, 1980, forbidding use of cash collateral.

1. The Statement did not include as a liability any of the obligations of the guarantors to Union Bank or Crocker.

(vi) The aforesaid Statement of Assets and Liabilities includes the following:

(a) that it is "limited to presenting in the form of financial statements information that is the representation of William Urbano."

(b) the following statement by Margolis: "I have not audited or reviewed the accompanying statement and, accordingly, do not express an opinion or any other form of assurance on it."

(c) that "The amounts shown as the estimated current values (column B) at December 31, 1979, were primarily submitted by William F. Urbano."

Taken at face value, the Statement indicates an excess of assets at "estimated current values" over liabilities of $4,212,500.[1] These assets consist of the following: (i) Accounts receivable from affiliates in which the guarantors assert an ownership interest. In some instances this is a fractional interest. (ii) Investments in corporations. The guarantors assert a 50% ownership in three of these corporations (including Kenny), and a 100% ownership in two other corporations. (iii) Fractional interests (between 3% and 50%) in seven or more partnerships. At the time of trial three of these interests had been liquidated and converted to notes receivable secured by real estate. (iv) Seven parcels of real estate, each of which secures a promissory note payable by Urbano.

Does this guaranty constitute adequate protection? The question may be restated: Does the existence of this guaranty constitute legal cause under the Code to permit the debtor to invade, impair, and perhaps destroy property rights and interests of Crocker in the disputed collateral?

Viewed most favorably from Crocker's position, the guaranty affords the right to institute legal action against the guarantor after, and to the extent that, loss is sustained as a result of Kenny's disposition of the collateral. Of course, a period of time must transpire, while Kenny is using the

collateral, and until the vicissitudes of Kenny's business fortunes are resolved, and it is finally determined whether the bank will sustain a loss. Thereafter, the bank can proceed against the guarantor. When the guaranty litigation is concluded, and the many legal issues available to a guarantor have been resolved by the trial court (and perhaps appellate courts), the bank may be able to enforce its claims against such of the guarantor's assets as are then available.[2] (The potential for competition between the bank and other of the guarantor's creditors should not be ignored.) Throughout this period of time, it is reasonable to assume that the bank will incur legal fees and costs incident to pursuing and protecting its position.

The bank urges that expectations based on pursuit of a guaranty are not within the provisions of the Code which define and balance the competing rights, powers and duties of debtors and secured creditors in property subject to a security interest; and that adequate protection is not and cannot be defined in terms of an unsecured contract of guaranty.

It is clear from the evidence in the case at bar that the continued possession, use, and exploitation by Kenny of the collateral in dispute is essential to its hopes of successful rehabilitation. It is equally clear that the bank has substantial interests of considerable value in that collateral. Serious question and honest disagreement may exist as to whether Kenny can fulfill the continuing and ongoing obligations associated with its use and exploitation of the collateral. If the rehabilitation is successful, the interests of the bank and the debtor may well survive intact. However, little doubt exists that significant loss may result to the bank if the debtor fails in its rehabilitation effort. That loss may be materially reduced, perhaps averted entirely, if the bank's request is granted and the debtor is denied access to the collateral.

Who should bear the risk of the loss incident to the failure of the rehabilitation effort? While differing economic and legal philosophies may produce different answers to this question, the court's inquiry is more limited: what provisions of the Code govern the resolution of this issue? What result flows from the application of these statutory principles?

■ The right of the debtor to use, sale or lease of collateral and cash collateral are governed by section 363.[3] In essence, rights to the use, sale, or lease of collateral in which the secured creditor and the debtor have an interest are conditioned upon providing adequate protection of the interest of the secured creditor.[4]

Whether the guaranty is and constitutes adequate protection under the circumstances here presented is a definitional determination which is essential to the resolution of the controversy between Kenny and the bank. What tools are available to fashion

**2.** With respect to partnership interest of the guarantor, however, the bank will have to institute proceedings to secure a charging order as required under California Law. (Calif. Corp. Code §§ 15028; 15522).

**3.** § 363(a) provides: "In this section 'cash collateral' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest."

§ 363(c)(2) provides: "The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

"(A) each entity that has an interest in such cash collateral consents; or

"(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

§ 363(e) provides: "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection."

**4.** The term "secured creditor" is intended to refer to the holder of an allowed secured claim. Although the Code speaks in terms of the holder of an allowed secured claim, the term "secured creditor" is so established in commercial and bankruptcy law and is so commonly understood to describe one situated as Crocker is in these proceedings, that its use may perhaps be forgiven.

such a definition? Resort must first be had to the provisions of the Code. Section 361 includes three specific examples of adequate protection.[5] Periodic cash payments is the first example. To the extent that such payments are made in a sum which balances any "decrease in the value" of the secured creditor's interest in the property, adequate protection is said to exist. The second example is an additional or replacement lien to the extent that it is sufficient to offset any "decrease in the value" of the secured creditor's interest. Third, the framing of an order which will result in "the realization" by the secured creditor of the "indubitable equivalent" of its interest in the property constitutes adequate protection.

The legislative history affords further insight into the meaning of adequate protection. Adequate protection ". . . is intended to protect a creditor's allowed secured claim." (H.R. 95–595, and 124 Cong. Record H. 11089). "The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. . . . Though the creditor may not receive his bargain in kind, the purpose of the section is to *insure that the secured creditor receives in value* essentially what he bargained for." (H.R. 95–595, p. 339, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6295, emphasis added). The purpose ". . . is to provide the protected entity with a means of realizing the value of the original property, if it should decline during the case, by granting an interest in additional property from whose value the entity may realize its loss." (H.R. 95–595, p. 339) U.S. Code Cong. & Admin.News 1978, p. 6296. Section 361(3) "gives the parties and the

courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved." (H.R. 95–595, p. 340) U.S.Code Cong. & Admin. News 1978, p. 6296. And finally, Section 361 "defines, more clearly than the others, the general concept of adequate protection by requiring such relief as will result in the realization of value." (H.R. 95–595, p. 340) U.S.Code Cong. & Admin.News 1978, p. 6296.

It is impossible to analyze these provisions of the Code and its legislative history in the context of the debtor's struggle for survival in the early stages of a Chapter 11 proceeding, without recognizing a statutory effort to provide rules of fairness and equity to govern, adjust, and balance the rights of secured creditors and debtors. No one questions the right of a debtor to a fair chance at rehabilitation. On the other hand, that right is not so pervasive as to permit the destruction of economic rights equally entitled to the sanction and protection of law. The cited provisions of the Code are an effort to balance these conflicting interests; to grant to the debtor the right to continued enjoyment and exploitation of property and assets upon which rehabilitation depends, not at the expense of secured creditors, but on terms which protect secured creditors in the *realization of the value* of their interests in such property and assets. Against the theme of adequate protection in the use of the secured creditor's collateral, the statute and legislative history repeat and emphasize the right of secured creditors to realization of the value of the collateral and the right to be protected against decrease in the value of the interests affected. To the extent that the debtor is unable to provide adequate protection *in these terms*, it is unable to play the

---

**5.** Section 361 provides that adequate protection may be provided by:

    "(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

    "(2) providing to such entity an additional or replacement lien to the extent that such

stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

    "(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."

game according to the rules. In such instances, the risk of financial loss incident to failure of the rehabilitation effort must be borne by the debtor.

The use of Crocker's cash collateral, and the depreciation associated with Kenny's use of the non-cash collateral, expose Crocker to a decrease in the value of its interests and a present risk of impairment of its ability to realize on the value of its collateral package. To compel a secured creditor to accept such risks on the basis of rights to pursue a guarantor, is to shift the hazards and the cost of the rehabilitation effort from the debtor to the secured creditor. Such a proposition is not within the contours of the concept of adequate protection embodied in the Code.

Accordingly, the debtor's request to vacate the order prohibiting use of cash collateral is denied. The motion of Crocker to prohibit the use, sale, or lease by Kenny of the motor vehicles constituting inventory and which were not leased on the date of filing, is granted. The use, sale or lease of such motor vehicles is prohibited without a prior order of this Court.

This Memorandum Opinion shall constitute findings of fact and conclusions of law, as provided in R 752(a).