**In the Matter of EARTH LITE, INC., Debtor.**

**SUN BANK/SUNCOAST fka Sun Bank and Trust Company of St. Petersburg, Florida, Plaintiff,**

v.

**EARTH LITE, INC., Defendant.**

**Bankruptcy No. 80–914 C.**

United States Bankruptcy Court, M. D. Florida, Tampa Division.

March 9, 1981.

Jary Streitweiser, Tampa, Fla., for Sun Bank/Suncoast.

Don M. Stichter, Tampa, Fla., for Earth Lite, Inc.

## ORDER ON MOTION TO ALLOW USE OF CASH COLLATERAL AND OTHER COLLATERAL

ALEXANDER L. PASKAY, Bankruptcy Judge.

This is a business reorganization case and the specific matter under consideration is presented for resolution both by the Debtor, Earth Lite, Inc. (Earth Lite) and by the Plaintiff, Sun Bank and Trust Company of St. Petersburg, Florida (Sun Bank). Sun Bank sought relief from the automatic stay imposed by § 362 of the Bankruptcy Code, but not satisfied with the 30-day time frame designed by Congress by § 362(e), Sun Bank moved on 24 hours notice, and sought an immediate hearing in order to get a preliminary injunction to prevent Earth Lite from using any of its collateral, i. e. the inventory and the monies received from the collection of accounts receivable. Earth Lite, faced with this challenge of its right to use its inventory and cash obtained from collection of accounts receivable, which challenge, of course, meant a kiss of death if successful, filed a Motion and sought leave to use cash collateral and other collateral pursuant to § 363.

The historical background of this controversy and the relationship of the parties is telling and is relevant to the matter under consideration. Earth Lite is engaged in processing glassware products, although in the conventional sense is not a manufacturer. It buys finished glassware of different shapes and sizes and decorates and dresses up the glass containers and then sells the finished product to gift shops and department stores. Prior to the commencement of the case, Earth Lite financed its operation, at least in part, through Sun Bank and received a loan from Sun Bank in the original amount of $350,000. This was a secured loan, collateralized by the inventory and the accounts receivable of Earth Lite. Earth Lite, filed its petition for an order for relief under Chapter 11 of the Bankruptcy Code on June 27, 1980. On the same date, Earth Lite was authorized to remain in possession and to operate its business under certain specific terms and conditions.

Shortly after the commencement of the case, Earth Lite and Sun Bank entered into a new agreement. According to the relevant terms of the agreement, Sun Bank agreed to lend to Earth Lite an additional $75,000 in exchange for some additional collateral, and for personal guarantees of insiders. The agreement called for periodic payments to be applied not only to interest, but also to principal. In addition, Earth Lite was required to pay attorney fees. The agreement called for the establishment of a "lock box" system designed to handle the collection of accounts receivable, to be supervised by an independent warehousing firm, Lawrence Warehouse, Inc. appointed by the parties to monitor the arrangement.

There is no question that the parties operated amicably under this arrangement until February of 1981 and Sun Bank received monthly not only the amount stipulated in the agreement, but also approximately $8,000, a reimbursement for attorney fees.

At the time of the commencement of this case, Earth Lite had on hand approximately $500,000 in inventory and approximately $90,000 in account receivables. The inventory valuation was based on a count taken as late as February 6, 1981, and although not based on cost, it included labor overhead, i. e. the cost of labor incurred by Earth Lite in connection with the process of turning the raw glassware into the finished saleable product. This overhead item, however, appears to be insignificant and would not require a significant readjustment of the values allocated to the inventory. Thus, since there is no evidence to the contrary in this record, the value of the inventory of Earth Lite as late as February 6, 1981 was far in excess of the debt owed to Sun Bank and secured by the inventory. Most importantly, this debt which has been reduced since the commencement of these proceedings from $425,000 to $288,000 is also secured by the accounts receivable of Earth Lite, and by additional collateral furnished by insiders to the Bank.

This additional collateral securing the personal guarantee of the insiders consist of a second mortgage on the principal residence of the president, a collateral assignment of a mortgage receivable, a mortgage lien on a condominium and on a cemetery lot. According to the schedules submitted by Earth Lite in connection with its Motion to Allow Use of Cash Collateral and Other Collateral the net equity of the insiders in these assets is in excess of $180,000,000.

There is no question that Earth Lite defaulted on the post-petition financing agreement in that it did not make the February payment to Sun Bank. It is equally clear that Earth Lite, as noted earlier, paid to Sun Bank more than $137,000 since the commencement of the proceeding.

Sun Bank seeks an immediate relief on the emergency basis because Earth Lite defaulted on the post-petition financing agreement and that the outlook of Earth Lite to survive, according to Sun Bank, is hopeless. Therefore, it should be entitled to sequester all funds currently in the special account which was set up to handle funds obtained through collection of receivables and is entitled to prevent Earth Lite to use these funds and its inventory immediately.

Of course, it does not take any imagination to conclude that if the relief sought by Sun Bank is granted, and Earth Lite is put out of business, the economic future and the life of Earth Lite as a functioning viable entity is doomed and Earth Lite would end up as just one more statistic in the great graveyard of ailing debtors who sought, but failed to obtain, rehabilitation under this Chapter.

The apprehension of a secured lender, especially one who has advanced additional funds after the commencement of a proceeding and who is already soured because of past unkept promises by the borrower is understandable. This is especially so if it appears that the economic health of the Debtor is shaky and steadily deteriorating. This reaction is not unusual and not surprisingly triggers the very type of litigation under consideration. This apprehension also tends to lead the secured lender astray and in the haste to obtain immediate relief, it loses sight of facts which are, and which are not, relevant to the matter under consideration.

To be fair, it is not only the secured lender who is led astray by the haste, but also the Debtor who understandably fears the possibility of immediate doom and the loss of its business and pleads for understanding on equitable grounds, relying on its valiant past efforts to live up to its obligations and pleads an excuse for its failure due to circumstances beyond its control, none of which are relevant to the matter under consideration.

Section 363 of the Bankruptcy Code provides that "cash collateral" means cash or other cash equivalents in which the estate

and an entity other than the estate has an interest. Whenever non-cash collateral is liquidated, the resulting proceeds are cash collateral so long as the proceeds continue to remain subject to the original lien. Congress, in enacting § 363 of the Code, gave a special treatment to "cash collateral" for the obvious reasons that cash collateral is highly volatile, subject to rapid dissipation and requires special protective safeguards in order to assure that a holder of a lien on "cash collateral" is not deprived of its collateral through unprotected use by the Debtor. On the other hand, it is evident that if a Debtor who seeks relief under Chapter 11 is deprived of the use of cash, its chances to secure rehabilitation are immediately destroyed and very few, if any, entities could survive and effectuate a reorganization without cash. The interests of the parties which, by their very nature, are irreconcilable and conflicting must be balanced according to the circumstances and the equities of the case, in order to achieve the possible protection of both interests and in order to carry out the aim and the purpose of this Chapter which is rehabilitation of ailing, but not yet dead business enterprises.

The Code provides certain protective devices designed to assure that the rights of a secured party are safeguarded. This could be accomplished by any method which furnishes "adequate protection" to the secured party. The term "adequate protection" is not defined in § 361 of the Bankruptcy Code which Section merely sets forth examples which include giving an additional or replacement lien to the secured party to compensate the secured party for the diminution of its cash collateral.

■ The Debtor points out that Sun Bank is amply secured and the Debtor has a very substantial "equity cushion" even without the security granted by the insiders to back up their personal guarantee. According to the Debtor, the "equity cushion" alone is sufficient adequate protection which would warrant the use of cash collateral, citing *In re San Clemente Estates*, 2 CBC 2d 1003, 5 B.R. 605 (Bkrtcy.S.D.Cal.

1980); *In re Shockley Forest Industries*, 5 B.R. 160, 3 CCH B.L. Rep. ¶ 67,883 at 78,202 (Bkrtcy.N.D.Ga.1980); *In re Rogers Development Corp.*, 2 B.R. 679 (Bkrtcy.E.D.Va. 1980). This is, however, an overstatement and oversimplification of the problem especially when one deals with the use of cash collateral. The cases cited by Earth Lite dealt with the concept of adequate protection in connection with a complaint which sought a modification of the automatic stay under § 362(d)(1), (2). This Court is satisfied that due to the different nature of the proceeding and due to the different collateral involved, the cases cited are not controlling and a debtor, before it is authorized to use cash collateral, cannot rest on its equity cushion, but must offer more to the secured party before it is entitled to use cash collateral.

The Debtor, in addition, in order to bolster his position, relies on the fact that as part of the post-petition agreement Sun Bank urged personal guarantees of the insiders. Therefore, that alone by itself would justify this Court to authorize Earth Lite to use the cash collateral. Sun Bank points out in opposition of this contention that a personal guarantee is not an adequate protection and does not warrant an order authorizing a debtor to use cash collateral. In support of this proposition, Sun Bank cites the case of *In re Kenny Kar Leasing*, 6 BCD 677, 5 B.R. 304 (Bkrtcy.C.D. Calif.1980), where the Court, discussing the nature of a personal guarantor, concluded that the personal guarantee is not legally sufficient to furnish adequate protection. While the Debtor's reliance on the personal guarantee of the insiders is misplaced, so is the reliance of Sun Bank in *Kenny, supra*. The personal guarantee in *Kenny, supra* was a totally unsecured obligation and the only evidence in that record, presented in support of the soundness of the personal guarantee, was an unverified statement of assets and liabilities of the guarantor. In addition, the values allocated to the assets of a guarantor came solely from the data submitted by the guarantor himself. It is not surprising that under these conditions the Court accorded no persuasive force to

the personal guarantee of the insiders and totally disregarded it in the valuation of the adequate protection offered by the debtor.

■ In contrast, in the present case, the personal guarantee of the insiders are amply secured by properties of the insiders which are valued in excess of $300,000 against which there is an indebtedness of less than $150,000. The guarantor in the Chapter 11 does not enjoy the automatic stay protection accorded to a guarantor in Chapter 13 by virtue of § 1301 of the Bankruptcy Code. Thus, Sun Bank can, in the event there is an additional default in the agreement, proceed to establish the liability of the prime obligor and then proceed, in the event it fails to obtain satisfaction, to foreclose its security interest on the property pledged as security for the indebtedness. Thus, neither the proposition urged by the Debtor nor the proposition urged by Sun Bank meets with pragmatic precision of the elusive concept of "adequate protection."

■ There are a variety of means by which this could be accomplished and the Court must fashion an appropriate "adequate protection" for a secured party after consideration of all facts involved and circumstances of the case.

For instance, this Court is satisfied that the Debtor should not be permitted to use cash collateral without making some payments to the secured party just because it has, at the commencement of the case, a meaningful equity cushion in the collateral. To accept this proposition would mean that a debtor may freely use cash collateral until the collateral is reduced to the amount of indebtedness during which time the secured party is deprived of income, for which it bargained when the loan was granted. In the present instance, the Debtor agreed to pay Sun Bank $12,500 a month. The Debtor is now in default on the February payment. The fact that the Debtor has an equity cushion, because on this record Sun Bank is oversecured, is not sufficient to relieve the Debtor of this monthly obligation, although it should be given an opportunity to cure this default within a reasonable time.

It is clear that a debtor as a general proposition must demonstrate with convincing proof that the Sun Bank is adequately protected without resorting to the crutch furnished by a personal guarantee of third parties. This is so because if it is attempted to be used to justify the use of cash collateral, due to the highly volatile nature of the cash collateral this is not enough since at the time the Sun Bank is able to resort to the enforcement of its claim on the guarantee both the cash collateral and the secured or unsecured assets of the guarantor may be dissipated leaving the secured party with no property which could be subjected to satisfy its claim. Since this Court is satisfied that Sun Bank is more than adequately protected at this time if the Debtor is required to resume the contractual payments and makes provisions for curing the default even without considering the value of the personal guarantee, it is clear on this record that Sun Bank is not entitled to a preliminary injunction and the Debtor is entitled to have immediate access to the monies in the "lock box" and shall be permitted in the future to use some of the proceeds of the collections to the extent that it is necessary to cure the existing default and to make the monthly payments agreed upon, commencing May 1, 1981.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Debtor shall commence making the monthly payments per the agreement as of May 1, 1981 together with one-half of the monthly payments in order to cure the default. It is further

ORDERED, ADJUDGED AND DECREE that Sun Bank shall release the funds in the "lock box" forthwith. It is further

ORDERED, ADJUDGED AND DECREED that the Sun Bank shall have the right to conduct periodic inspections of its collateral and continue the "lock box" arrangement with the proviso that the Debtor's request for release of the funds shall be granted under the terms and conditions agreed upon by the parties in the agreement.