In re SAN CLEMENTE ESTATES,
Debtor.

CITY NATIONAL BANK, a National
Banking Association, Plaintiff,

v.

SAN CLEMENTE ESTATES, Defendant.

Bankruptcy No. 80–00710–K.
Complaint No. C80–0102–M.

United States Bankruptcy Court,
S. D. California.

Aug. 11, 1980.

Benjamin E. King, Los Angeles, Cal., for plaintiff.

Keith McWilliams, McWilliams, Amos & Curnow, San Diego, Cal., for debtor/defendant.

MEMORANDUM OPINION IN SUPPORT
OF JUDGMENT CONTINUING
AUTOMATIC STAY

JAMES W. MEYERS, Bankruptcy Judge.

I

On March 28, 1980, the plaintiff, City National Bank ("Bank"), filed this complaint seeking relief from the automatic stay. The debtor, San Clemente Estates,[1] requested a hearing on April 7, 1980, and filed an answer on April 25, 1980. A preliminary hearing was held before this Court on April 30, and May 1, at which the parties presented evidence, both oral and documentary, and argued the case. This Court determined that the automatic stay should remain in effect pending the final hearing. The final hearing was held before this Court on various dates in May and June, 1980, and was concluded on July 1, 1980. At the conclusion of the final meeting this Court ordered that the automatic stay should remain in effect pending the filing of this decision.

II

FACTS

On August 25, 1977, the Bank[2] entered into a construction loan agreement with the debtor, a joint venture then consisting of Mr. Donal J. MacAdam and the Santa Ana Valley Irrigation Company, Inc. Under this agreement the Bank committed itself to loan up to $5,350,000 for the purchase and development of 188 acres of raw land located in the City of San Clemente, California ("City"), known as "Linda Mar Estates". Any funds advanced under the associated promissory note were to be secured by a deed of trust on the property to be purchased. The promissory note required monthly payments of interest assessed at the Bank's prime rate, plus 2.5%, with a minimum interest of 9.25% per annum. In addition, the Bank charged a loan fee of $80,250, which it deducted from the loan proceeds. Pursuant to the loan agreement the Bank advanced $2,757,237.63 to cover land acquisition, loan fees and other fees and costs incurred in the development of the project.

On August 30, 1977, the City approved the subdivision agreement which was to expire in two years time.[3]

In late 1977, the debtor engaged in an extensive "pre–sale" program, under which commitments were apparently made, mainly to the general public, to sell 160 of the lots to be developed prior to the actual development work being concluded. Many of the purchasers gave deposits on the lots.

In the Spring of 1978, the debtor received bids on the development of the project. These bids were far in excess of the cost estimates anticipated when the construction loan agreement was executed, this caused in large part by a grading law change by the City. It was clear that the loan commitments would not be adequate to develop the property as originally contemplated.[4] After the bids were received the development came to a halt and has not started up again.

Late in 1978, the debtor held a meeting with Bank officials and requested that the loan commitment be increased to reflect the higher costs of development. The debtor also revealed that some of the pre–sale funds on deposit had been mishandled and diverted. The Bank did not act on this information, even though it could be considered an anticipatory breach, but instead waited for an actual breach. This occurred as of March 1, 1979, when the debtor failed

---

1. A California general partnership consisting of Intercoast Real Estate Development Company, Randolph Parks, Inc., and American Land Systems, Inc.

2. A moderate sized institution with over one hundred million dollars in real estate loans outstanding.

3. On August 1, 1979, the San Clemente City Council granted an extension on the agreement to August 30, 1980.

4. It also became evident that the "pre–sold" lots had been priced much too low as the cost of acquisition and development of the lots would exceed the price to be received.

to make the payment on the promissory note then due. Based on the debtor's defaults a notice of default and election to sell under the deed of trust was recorded on March 15, 1979, with the sale being set for July 10, 1979.

Shortly before the foreclosure sale was to take place the Bank granted a series of extensions of time in return for payments totalling $225,000. These fees were paid by the Southport Development Corporation ("Southport") which was then interested in taking over the project. The final extension secured by Southport expired on January 28, 1980, when it declined to pursue the matter further. However, the Bank gave another extension so that the Ferrante Construction Company could investigate the project. When these negotiations failed the Bank setoff the debtor's certificate of deposit of $365,721.91 against the principal amount of the promissory note and scheduled the foreclosure sale for March 27, 1980. This sale did not take place as the debtor filed for protection under Chapter 11 of the Bankruptcy Code ("Code") on March 26, 1980.

As of June 16, 1980, the debtor had incurred the following encumbrances against the Linda Mar Estates property:

| OBLIGATION | AMOUNT |
| --- | --- |
| —Promissory Note dated 8–25–77 due to Bank | |
| —Principal balance | $2,391,515.72 |
| —Accumulated interest | 700,128.99 |
| —Attorneys and other fees | 64,089.73 |
| | $3,155,734.44 |
| —Mechanics liens filed by James E. Crosby Engineers, Inc. on 1–15–79 | $ 56,415.28 |
| Total Encumbrances | $3,212,149.72 |

The Linda Mar Estates property consists of 188 acres of natural undeveloped rolling hills located in the beautiful coastal city of San Clemente, which is a fast growing preferred residential area in South Orange County. It is planned for the property to be developed into 224 lots for sale as single family residential lots and one lot for construction as a planned unit development of 26 condominium units. The site provides almost all the planned lots with an expansive blue–water ocean or canyon view, and is situated at such a high elevation that the impact of the commercial and residential developments in the foreground is kept to a minimum.

Now to reach an estimation as to the value of this property it is assumed that the highest and best use of this realty is as a residential subdivision. In appraising this property the most accurate method available is the "developmental" or "land residual" approach. Under this method the sales value of the lots is calculated and then the costs of development and sales, plus a reasonable profit, are deducted to reach the actual value of the land in its present state. Here, the lots would sell at retail, as follows:

| No. of Lots | View Potential | Average Sales Price Per Lot | Amount |
| --- | --- | --- | --- |
| 108 | Premium Ocean | $150,000 | $16,200,000 |
| 22 | Ocean/Canyon | 125,000 | 2,750,000 |
| 59 | Canyon | 110,000 | 6,490,000 |
| 35 | Negligible | 85,000 | 2,975,000 |
| 1 | Planned Unit Development | — | 520,000 |
| | TOTAL SALES VALUE | | $28,935,000 |

Against these projected sales receipts must be deducted estimated costs and a reasonable profit:

| Description | Amount |
| --- | --- |
| —Grading | |
| —Including movement of 3,269,000 cubic yards of soil at $1.00 per cubic yard | $ 4,538,400 |
| —Street Improvements | 1,379,500 |
| —Landscaping | 978,100 |
| —Storm Drain | 884,200 |
| —Water | 646,700 |
| —Water Reservoir | 595,000 |
| —Sewer | 407,100 |
| —Utilities | 405,000 |
| —Engineering Consultants | 400,000 |
| —Contingencies—20% on above costs | 2,046,800 |
| TOTAL COSTS TO DEVELOP | $12,280,800 |
| —Financing Costs | |
| —Calculated assuming 16% interest, and that entire land purchase price and development costs are borrowed and entire project to be sold in three years, plus 1% loan fee | 4,550,000 |
| —Sales and Closing Costs—4% of sales | 1,160,000 |
| —Administrative Expenses—2½% of Sales | 725,000 |
| —Profit Factor—17% of Sales | 4,900,000 |
| TOTAL COSTS AND PROFITS | $23,615,800 |

Thus, under the residual method we take the total expected sales of $28,935,000 and deduct the total of the costs to develop and sell, and a profit factor, of $23,661,568, to give the residual value of the property at this time of $5,319,200.

Mr. John Adams, the appraiser presented by the Bank, arrived at a fair market value, using the residual method, of $3,750,000.[5] This Court finds his analysis lacking in several significant ways. First, Mr. Adams overstated the cost of soil moving given the latest estimated total number of yards to be moved. Second, he included $112,000 for 14″ pipe for the water reservoir which is not needed. Third, he discounted the residual value by over 2¼ million dollars to reflect the ravages of inflation. This discount was not well taken for the general effect of inflation would naturally result in higher sales prices for the lots. Also, the effect of inflation is amply reflected in the cost of money which has been liberally applied under the Court's assumption of 100% financing of the project. Naturally it is expected that any developer will have to make a substantial capital contribution to the project. This, of course, will significantly reduce the interest expense, but a corresponding increase in the profit potential will have to result in order to adequately compensate investors. Fourth, Mr. Adams also assumed that the project would take 51 months to fully develop and sell. Given the nature and problems anticipated here it appears that a more reasonable estimate of time required to close out the project would be 45 months, including the three year sales program.

This Court's conclusion as to the value of the subject property has been corroborated in a most direct way, for on June 18, 1980, Judge Herbert Katz, of this Court, con-

firmed a sale of this property for $5,100,000. Now this sale has two major contingencies. The property must be conveyed with a marketable title free and clear of all liens and encumbrances, except for the first trust deed, and the City must extend the presently existing subdivision agreement for at least an additional 180 days.

The first of these contingencies appears to present little problem as the debtor has a tentative agreement with almost all of the buyers of the "pre-sold" lots. The second condition presents a more difficult problem for on June 18, 1980, the San Clemente City Council declined to grant the requested extension and scheduled a public hearing on the question. This action puts the sale in jeopardy for without the extension from the City the escrow cannot close. However, the purchasers have indicated that they are prepared to go forward on the purchase even if the extension is not granted until after the current deadline of August 30, 1980. If the City fails to grant the requested extension and the subject property reverts to raw acreage, then the City will be liable to reimburse the debtor for most of the fees and deposits it has made, which now total $615,052.[6]

In addition to the funds borrowed from the Bank, the individual partners have spent over 1.8 million dollars on the debtor's affairs.

## III

## DISCUSSION

The Bank was automatically restrained in pursuing its foreclosure action when the Chapter 11 petition was filed, for Section 362(a)(4) stays any act to enforce a lien against property of the debtor. 11 U.S.C. § 362(a)(4). See H.R.Rep. No. 595, 95th

5. Mr. Adams "verified" his appraisal by comparing it with his estimation as to the value of the property if it were returned to its natural state as raw land, which he calculated would be $3,900,000.

6. There has been some evidence in regard to additional park, sewer connection and school fees being assessed on this development. It has been assumed that any current fee require-

ments are fully reflected in the sales price or in the estimated costs to develop. Any new or additional assessments have not been considered as that would be pure speculation at this point. If substantial changes in the fee structure are made then that may constitute grounds for the Bank to move this Court to reconsider its judgment.

Cong., 1st Sess. 340–341 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963 ("House Report"). However, this automatic stay is not a permanent injunction. *House Report, supra,* at 341.

■ When the holder of a claim secured by a lien on property of the debtor requests relief from the automatic stay, then expeditious hearings must be held in order to insure that the holder's interest in the property is *adequately protected.* See Orr & Klee, *Secured Creditors Under The New Bankruptcy Code,* 11 Unif.Com.C.L.J. 312, 324 (1979); 11 U.S.C. §§ 361, 362(d)(1), 362(e). The term "adequate protection" is not defined in the Code. *In re Pitts,* 2 B.R. 476, 477, 5 B.C.D. 1129, 1130 (Bkrtcy.C.Cal. 1979); *In re Rogers Development Corp.,* 2 B.R. 679, 5 B.C.D. 1392, 1394 (Bkrtcy.E.Va. 1980). Instead in Section 361 the Code states three non-exclusive methods of providing adequate protection to an entity with an interest in property of the debtor. 11 U.S.C. § 361. These examples are not intended to be exclusive or exhaustive, but are rather to illustrate means whereby adequate protection may be provided and to define the contours of the concept itself, which:

> is derived from the fifth amendment protection of property interests. *See Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the

purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

*House Report, supra,* at 339, U.S.Code Cong. & Admin.News 1978, at 6295.

■ This concept of adequate protection apparently initially sprang from the venerated pen of Judge Learned Hand in *In re Murel Holding Corporation,* 75 F.2d 941 (2d Cir. 1935), where he indicated the term was vague but it intended that the secured claim must be compensated completely. Then he introduced the equally vague corollary of "indubitable equivalence." 75 F.2d at 942. Now "adequate protection" has been established in the Code as the touchstone against which complaints to dissolve or modify the stay must be tested. As mandated by the Code this standard is applied as a matter of right and not as a matter of discretion. *See .2 Collier on Bankruptcy,* § 361.01 at 361–5 (15th ed.) ("*Collier*"). Adequate protection must be applied in light of the peculiar facts of each case and upon the equitable considerations arising therefrom. *See House Report, supra,* at 339. *See also 2 Collier, supra,* § 361 at 361–6, 361–15.

■ It is not for the Court to devise the method of providing adequate protection, instead it is committed to the debtor to propose the method to be used. *House Report, supra,* at 338. Here the debtor has simply proposed that the property itself has sufficient value to constitute adequate protection. While this method is not specifically delineated in Section 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court. *See Matter of Blazon Flexible Flyer Inc.,* 407 F.Supp. 861, 865 (N.Ohio 1976). This opinion regarding the appropriateness of the "equity cushion" method has already been widely adopted in decisions interpreting Section 361. *See In re Rogers Development Corp., supra,* 2 B.R. 679, 5 B.C.D. at 1394; *In re Pitts, supra,* 2 B.R. at 478–79, 5 B.C.D. at 1130; *In re McAloon,* 1 B.R. 766, 5 B.C.D. 1207, 1208 (Bkrtcy.E.Pa.1980); *Matter of Sulzer,* 2 B.R. 630, 5 B.C.D. 1314, 1316 (S.N.Y.1980);

2 Collier, supra, §§ 361.01[3] at 361–9; 362.-01[1] at 362–15.

■ In judging this proposal it should be noted that the Bank has the burden of proof on the issue of the debtor's equity in the collateral, but the debtor has the burden on all other issues including adequate protection. 11 U.S.C. § 362(g). See Orr & Klee, Secured Creditors Under The New Bankruptcy Code, supra, 11 Unif.Com.C.L.J. at 323.

■ Based on the evidence presented, this Court has found that the subject real property has a fair market value [7] of approximately $5,319,000, against which stand liens and encumbrances of $3,212,149.72, leaving an equity "cushion" of over 2.1 million dollars. This is a considerable cushion exceeding the encumbrances by over 65%. One court has recently held that in cases of land, a cushion of 40 to 50% is required to provide the necessary protection. Matter of Lake Tahoe Land Co., Inc., 5 B.R. 34, 6 B.C.D. 262, 264 (Nev.1980). Now this quantitative approach may have the salutary effect of giving precise guidance as to the standard to be used, but it does seem to be inconsistent with the Congressional intent that each case is to be judged on its own facts. House Report, supra, at 339.

Here counsel for the Bank made an eloquent plea during final argument for this Court to insist on a cushion of at least 33⅓ %. This large an equity would appear to be unjustified in this case where the property in question is located in one of the nation's most dynamic and fast growing residential areas. But, nonetheless, even the Bank should be satisfied given that the cushion is almost twice the amount it suggested. Thus, this Court finds that the debtor has adequately protected the interest of the Bank as required by Section 362(d)(1). See 11 U.S.C. § 362(d)(1).

■ The Bank also requested relief under Section 362(d)(2), which applies only to the stay of an act against property and requires that the stay be lifted where there is a lack of equity and no need for the property for

an effective reorganization. 11 U.S.C. § 362(d)(2). The debtor makes a rather strained argument that this section is the only standard to be met and it can be satisfied by a simple showing that the property is necessary for a successful reorganization with no need to provide adequate protection. While Section 362(d)(2) appears to be applicable only in Chapter 11 proceedings, see Matter of Feimster, 3 B.R. 11, 6 B.C.D. 131, 133 (Bkrtcy.N.Ga.1979), it cannot be read to exclude Section 362(d)(1) from consideration in cases involving stays of acts against property. Section 362(d)(2) reflects Congressional intent to allow creditors to immediately proceed against the property where the debtor has no equity and it is unnecessary to the reorganization, even where the debtor can provide adequate protection under Section 362(d)(1).

■ Here the debtor has no problem in satisfying either prong of the requirements of Section 362(d)(2). The property is clearly essential to these proceedings for it constitutes the only asset available for the debtor to build a plan around. Also, since this Court has already found considerable equity in the property, then Section 362(d)(2)(A) has been fully satisfied. In this regard the Bank relied heavily on In re Castle Ranch of Ramona, Inc., 3 B.R. 45, 5 B.C.D. 1386 (Bkrtcy.S.Cal.1980). But in that case the court found that the stay must be lifted because the debtor had no equity in the property. 3 B.R. 45, 5 B.C.D. at 1388. Here, the debtor's substantial equity in the property completely satisfies the requirements of Section 362(d).

Before this Court the Bank vigorously argues that if the subdivision agreement is not extended the property could revert to raw acreage with its value "plummeting". This greatly concerns this Court for it appears likely that the subdivision agreement will lapse absent some affirmative relief being granted by the City. However, it seems reasonable to expect that the City will not act rashly and in effect penalize the debtor simply because it was too cash poor

---

7. See In re Rogers Development Corp., supra, 2 B.R. 679, 5 B.C.D. at 1395.

to develop the project on the timetable originally contemplated. This presumption is reinforced by the fact that the City would be liable to the debtor for a substantial sum for return of the fees and deposits the latter has paid on this development. More importantly, if the property reverts to raw acreage its fair market value would still be $3,900,000. This would produce an equity cushion of approximately $687,800. While this would appear ample at this time, it should be noted that the costs associated with sale of this property in bulk could amount to as much as 12% of the sales price. Thus, if this property reverts to raw land the equity cushion would appear to be precariously close to being inadequate. If reversion occurs the Bank can, of course, file another complaint so that this Court can redetermine the issues in light of the changed circumstances. *See In re Rogers Development Corp., supra,* 2 B.R. 679, 5 B.C.D. at 1397. At that time the debtor could offer an enhanced method of protection.

In reaching the conclusion that the stay should remain in force, this Court is well aware that as a court of equity it must fully consider the individual circumstances of the parties and weigh the so-called "balance of hurt" that results from its decisions. *See* 2 *Collier, supra,* §§ 361.01[4] at 361–11; 362.-07[1] at 362–47. There is a strong public policy in maintaining the integrity of banking institutions, especially in these perilous times when we have a particularly unstable banking and monetary system. In the instant case the bank is left with a substantial unproductive loan in its portfolio. However, since the chapter proceedings were commenced the debtor has worked diligently to solve its problems. This sustained action by the debtor in its attempts to salvage its large investment outweighs the public policy considerations. But the balance could shift if the debtor falters in its performance during the course of these proceedings.

One last matter should be addressed. In its answer the debtor claimed that the $225,000 paid by Southport to the Bank should be credited against the obligations to the Bank by way of "offset". Since no evidence has been presented to show that the debtor is entitled to any claim regarding these funds, then no credit will be given.

## IV

### CONCLUSIONS

1. The debtor has considerable equity in the property known as Linda Mar Estates.

2. This equity provides adequate protection for the interest in the property held by the Bank and thus satisfies the requirements of Section 362(d). 11 U.S.C. § 362(d).

3. Since the Bank's interest is adequately protected, then its application to lift the stay is denied.

4. This opinion shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 752.