**In re THOMAS PARKER ENTERPRIS-ES, INC. d/b/a Chinetti International Motors.**

**Bankruptcy No. 205–5–80–00895.**

United States Bankruptcy Court, D. Connecticut.

Jan. 16, 1981.

Slavitt, Connery & Vardamis, Norwalk, Conn., for debtor.

Gitlitz, Ronai & Berchem, P. C., Milford, Conn., for Citytrust.

DECISION ON DEBTOR'S APPLICATION FOR USE OF COLLATERAL AND PROCEEDS FROM COLLATERAL AND CITYTRUST'S MOTION TO PROHIBIT USE, SALE, OR LEASE OF COLLATERAL

HOWARD SCHWARTZBERG, Bankruptcy Judge.*

The above-named debtor, an automobile dealer engaged in the business of selling Ferrari, Saab and Alfa Romeo automobiles in Greenwich, Connecticut, has made application to this Court for authorization to use collateral and proceeds from collateral which are subject to a security interest in favor of Citytrust Corporation in most of the assets of the debtor, including the debtor's inventory of automobiles and the proceeds from such inventory. Citytrust, a corporation organized and existing under the banking laws of the State of Connecticut has countered the debtor's application with its own motion to prohibit the debtor's use of the secured collateral and proceeds.

The specific relief sought by the debtor is couched in the following language:

" ... [T]he debtor requests of the court an order authorizing it to continue to borrow from the bank, pursuant to the existing credit loan and security agreements between the bank and the debtor, and to continue in favor of the bank the security provided under the existing loan agreements and to further order the arrangement whereby proceeds from the sale of inventory shall be used by the debtor to purchase new inventory from the same manufacturer, and that the bank's security interest shall continue in the new item of inventory, and to further order that the bank shall continue to furnish cash drafts so as not to frustrate the aforedescribed arrangement and to continue the executory agreements."

Citytrust maintains that adequate protection for its interest in the proceeds from the secured inventory has not been provided by the debtor and that this court should enter an order directing:

"1) that the debtor in possession be ordered to cease the spending of proceeds from the prepetition inventory and accounts receivable which are in, or which hereafter come into its possession, custody or control;

2) that the debtor in possession be ordered to place into a segregated account all future collections of proceeds from Citytrust's security;

3) that the debtor in possession be ordered to place into such segregated account a sum sufficient to cover proceeds of Citytrust's collateral which it heretofore has disposed of ...".

## FINDINGS OF FACT

1. The debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 1101 et seq., on December 4, 1980 and has continued to operate its business as a retail automobile dealer in Greenwich, Connecticut.

2. Citytrust is the holder of a secured claim against the debtor for the sum of $776,496.29 as of May 10, 1979, evidenced by a series of promissory notes executed by the debtor and secured by all of the debtor's accounts receivable, inventory, including automotive parts and accessories, together with their proceeds.

3. Pursuant to an agreement in writing, dated May 10, 1979, the parties agreed that the debtor's obligation to Citytrust in the amount of $776,496.29, which was guaranteed by the debtor's principal, Thomas G. Parker, was extended to January 1, 1980, at which time all sums owed by the debtor to Citytrust were to become due and payable. The agreement also required Thomas G. Parker to invest $200,000 in the debtor's business of which $150,000 was loaned to him by Citytrust; the remaining $50,000 was to be provided by him individually. Citytrust, in turn, agreed to continue to provide inventory financing to a maximum

---

* U.S.B.J., Southern District of New York, sitting by designation of the Chief Judge, United States Court of Appeals, Second Circuit.

of $600,000. All new automobiles were to be financed at their dealer cost.

4. The loan agreement was extended by three separate written amendments dated February 6, 1980, April 21, 1980 and July 24, 1980, with the result that all sums due and owing by the debtor to Citytrust became due and payable on October 31, 1980, a little over one month before the debtor filed its Chapter 11 petition.

5. The arrangement under which the debtor operated in accordance with the loan agreement called for Citytrust to provide cash to the extent of 100% of the debtor's cost to purchase automobiles for resale, in exchange for which Citytrust received the title documents to the vehicles. The debtor then received possession of the vehicles for sales purposes. When a vehicle was sold Citytrust would turn over the title document in exchange for the payment called for under the arrangement between the parties, which also included interest and finance charges.

6. In December, 1978, Citytrust discovered that it financed the debtor's purchase of vehicles to the extent of $200,000 for which the debtor did not have vehicles in its possession to correspond to the amount advanced. In short, the debtor had sold out of trust $200,000 worth of collateral to which Citytrust was entitled to be secured. Thereafter the parties negotiated a new loan agreement dated May 10, 1979, which contained a schedule for reducing the then $776,496.29 indebtedness to the point where Citytrust would then finance on a secured basis up to $600,000 of the debtor's inventory at dealer cost.

7. In at least two instances after the execution of the loan agreement on May 10, 1979 the debtor sold vehicles out of trust in that the proceeds from the debtor's sales were not remitted to the trust account in which the funds should have been deposited, although the vehicles left the possession of the debtor. Apparently, one vehicle was not financed by Citytrust. However, as to the second vehicle, which was financed by Citytrust, the purchaser of the vehicle has commenced an action against Citytrust, to recover the title document to the vehicle which is held by Citytrust.

8. The debtor presently owes to Citytrust a total amount of $521,576.37, of which $490,335.86 represents principal and $31,240.51 reflects unpaid interest.

9. The collateral securing Citytrust's claim consists of eight Ferraris, six Saabs, one Alfa Romeo and two used Saabs, for a total of seventeen vehicles having an aggregate value of $435,532. This value is determined by the debtor's invoiced cost to acquire these vehicles. Citytrust financed the debtor's acquisition on the basis of 100% of the debtor's cost. Since these vehicles are high quality foreign automobiles, they tend to appreciate with the passage of time for a limited period. However, the loan agreement specifically provides that after a certain period during which a vehicle remains in stock its value shall be reduced. Thus, as to all Ferraris, Saabs and Alfa Romeos after the seventh month in stock there would be a reduction or curtailment in financing eligibility value of 16⅔% for each stock month thereafter.

10. Although the value of the seventeen cars covered by Citytrust's security interest is calculated to be $430,532, there is a vehicle not in the debtor's possession for which Citytrust holds title documents; namely one Ferrari valued at $43,440, based upon the debtor's cost. Upon subtracting the value of the missing Ferrari, it follows that the value of the vehicles in the debtor's possession is $387,092, against which Citytrust holds title documents for seventeen vehicles as security for its claim of $521,576.37.

11. It is evident that the retail price for these vehicles is higher than the debtor's cost, the difference being the debtor's profit, after deducting costs and expenses. Thus, a Ferrari which costs the debtor approximately $47,000 might be sold at retail at approximately $53,000. Therefore, if the collateral were liquidated in a reasonably commercial fashion, there should be realized more than the debtor's cost to acquire the vehicles, which is the basis upon which Citytrust financed them.

12. Although Citytrust is the debtor's main source of financing it has also obtained financing from two other banks. It at one time enjoyed a line of credit with the State National Bank of Greenwich, Connecticut as high as $340,000. The debtor currently owes that bank approximately $170,000, for which the State National Bank holds as security the personal guaranty of the debtor's principal, Thomas G. Parker, a guaranty secured by Mr. Parker's family trust and title documents covering the vehicles financed. However, this bank has declined to floor plan the debtor's inventory needs. There are also funds owed to the Amity Banking Corporation with respect to the purchase of two vehicles, one of which was sold out of trust and for which Thomas G. Parker has personally assumed the obligation to repay.

13. In addition to Citytrust's secured interest in the debtor's property, Thomas G. Parker also agreed, pursuant to the loan agreement dated May 10, 1979, to pledge to Citytrust the first $75,000 of his right, title and interest in and to a limited partnership called "Caulkins Citrus Company, Ltd." Citytrust also holds a mortgage on Mr. Parker's interest in waterfront property in Bermuda, which is owned by him and his two brothers. Additionally, Citytrust has a mortgage on Mr. Parker's one-third interest in a residence on one acre of land in Greenwich, Connecticut, which is subject to a recorded first mortgage of $65,000.

14. During the first three years after Mr. Parker acquired his interest in the debtor's business in 1977 it has not shown a profit except for 1980, which he reports will reflect a profit of between $60,000 and $80,000. Mr. Parker testified that in 1978 the debtor sold 39 Ferraris; in 1979 it sold 35 Ferraris and in 1980 it sold 28 Ferraris. However, the debtor's accountant opined that the debtor could make a profit in 1981 because of its reduced payroll, reduced advertising expenses and improved operation of its service department. He believed that the debtor was a well-run automobile agency. The debtor concedes that the automobile business has been slow lately, but is optimistic as to sales in the Spring of 1981.

15. As an additional consideration to support its request for use of the collateral and proceeds therefrom, Thomas G. Parker has offered to waive any defenses he might have as a guarantor so that no act of Citytrust would be deemed to impair its rights as to Mr. Parker's guaranty.

16. Apart from whatever value may exist in the collateral held by Citytrust with respect to Mr. Parker's personal interests, there currently exists a deficiency of $124,484.37 between Citytrust's claim of $521,576.37 and the dealer cost of the vehicles in the debtor's possession valued at $387,092.

17. It is apparent that if the debtor's application to use the collateral and proceeds is not granted, it will be forced to discontinue business, resulting in a liquidation of its assets by the secured creditors. Indeed, Citytrust has already filed a complaint to be relieved from the automatic stay under Code § 362 so that it might be permitted to foreclose on its secured interest. That proceeding will be heard later this week. Accordingly, the sole issue before this court now is whether or not the debtor may use the collateral and proceeds covered by Citytrust's secured interest.

## DISCUSSION

The sole issue now before the court is whether or not the debtor should be permitted to use the cash proceeds from the sale of automobiles and inventory in its business as a retail automobile dealer holding franchises for the sale of Ferrari, Saab and Alfa Romeo vehicles. The automobiles and inventory are subject to a lien securing advances and loans made by Citytrust, a Connecticut banking institution, who acted as the major financier of the debtor's inventory and who now opposes such use of the cash collateral on the ground that it is not adequately protected.

It is important to note that since there is also pending a complaint filed by Citytrust to lift the automatic stay imposed under Code § 362, which will be heard separately after the instant proceeding is resolved, this court will limit the scope of its determina-

tion solely to the issue relating to the debtor's right to use cash collateral.

### USE OF CASH COLLATERAL

Cash collateral, as defined in Code § 363(a) means not only cash but also documents of title and other cash equivalents in which the debtor and Citytrust have an interest. The debtor's right to use such cash collateral is governed by Code § 363(c)(2), which provides:

> "The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

Citytrust objects to the debtor's use of the cash collateral derived from its secured interest because it is entitled to adequate protection of its secured interest, in accordance with Code § 363(e), and therefore it contends that it is not adequately protected within the meaning of Code § 361.

██ Citytrust reasons that the debtor's proposal to give Citytrust a replacement lien on the new or substitute inventory that the debtor acquires with the use of the segregated cash proceeds from the sale of its present inventory does not provide adequate protection, notwithstanding that the debtor would also pay the contract interest rate of 3% over prime, or currently 23%, for the use of such funds. This argument is premised on the established fact that the value of the current collateral does not fully secure Citytrust's debt. This court has found that value of the automobiles in the debtor's possession subject to Citytrust's lien is $387,092.00. This value was based on 100% of dealer cost, which was the amount advanced by Citytrust for each vehicle. Manifestly, the wholesale value to the financier, and not what a retailer would realize, is the appropriate standard. *In re Adams*, 2 B.R. 313, 5 B.C.D. 1234 (Bkrtcy.M.D. Fla.1980). Since the indebtedness to Citytrust is $521,576.47, there is no question

that the value of the automobiles is less than the debt. Concededly this is substantially what the debtor's financial picture looked like when it filed its petition for relief under Chapter 11.

However, the issue at this time is not whether the secured creditor should be relieved from the automatic stay imposed under Code § 362 because the secured creditor is not adequately protected or because the debtor lacks equity and there are no prospects for an effective rehabilitation. Evidence as to these issues will be presented later when the court entertains Citytrust's pending application for such relief. At that time it will be necessary to determine the value of all of the collateral held by Citytrust. Suffice it to note that the court is aware that a creditor's additional right to pursue a guarantor is of doubtful value. *In re Kenny Kar Leasing, Inc.*, 5 B.R. 304, 6 B.C.D. 677 (Bkrtcy.C.D.Calif.1980). Moreover, a mortgage on Bermuda property where only one of three guarantors has consented is also of questionable value. So too is a second mortgage on property in Connecticut which is subject to a life use in a third party. Similarly, a partial assignment to the right to receive proceeds upon the dissolution of a limited partnership growing citrus fruit in Florida leaves this court cold, apart from consequences of the current frost in the citrus area in Florida. Had the issue with regard to the automatic stay under Code § 362 been treated simultaneously with the application to use cash collateral under Code § 363(c)(2), this court would then give consideration to ascertaining the value of all of the secured creditor's collateral, as in *Anchorage Boat Sales*, 4 B.R. 635, 6 B.C.D. 495 (Bkrtcy.E.D.N.Y. 1980), where the court found that on balance, the secured creditor would not be adequately protected if the stay were allowed to continue. In considering the secured creditor's right to proceed with foreclosure the court might then give appropriate recognition to the fact that the secured creditor structured the transaction in order to create a cushion of protection as part of the bargain so that to postpone foreclosure

in the face of an erosion of such cushion, if one does exist, may jeopardize the secured creditor's interest. *In re Pitts*, 2 B.R. 476, 5 B.C.D. 1129 (Bkrtcy.C.D.Calif.1979); *In re Terra Mar Associates*, 3 B.R. 462, 6 B.C.D. 150 (Bkrtcy.D.Conn.1980).

In the light of the nebulous worth attending the so-called additional collateral held by Citytrust there appears to be some justification for its argument that it does not now have the benefit of its bargained for protection, especially when the debtor has sold vehicles out of trust. However, this condition existed before the debtor filed its petition under Chapter 11. There is no proof that the vehicles and inventory have depreciated in value since the filing of the Chapter 11 petition. Indeed, Citytrust would prefer to have the debtor sell the automobiles at retail in the ordinary course of its business rather than assume responsibility for their liquidation. Understandably, Citytrust is not an automobile dealer and cannot expect to realize the retail price that the debtor would obtain. There is no evidence that the vehicles will depreciate in value while they remain in the debtor's possession for resale, at least during the first seven months in stock. For each month after the seventh stock month there will be a curtailment in value, as reflected in the contract between the parties. The Ferraris, Alfa Romeos and Saabs for resale are not valued in the same fashion as automobiles held for rental purposes, as in *In re Kenny Kar Leasing, Inc.* supra, where the court properly found that because of the depreciating nature of leased vehicles, the secured creditor was not adequately protected.

In this case the debtor has offered Citytrust a replacement lien on new inventory to be acquired as a result of its proposed use of the proceeds from the sale of secured collateral, which proceeds would be segregated for Citytrust's account, together with interest at 3% over the prime rate, with the difference, or profit on the retail sale made available to the debtor to continue its business. Citytrust agrees that the proceeds should be segregated for its account, but objects to their use for the purchase of new inventory notwithstanding that it would have a replacement lien on the new inventory.

Code § 361(2) specifies that a replacement lien is one means of providing adequate protection and states as follows:

"When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by . . .

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property;"

The legislative history reveals that this method applies to the extent of a decrease in the value of the collateral, which in this case does not appear to be critical during the first seven months in stock. *House Report No. 95–595*, 95th Cong., 1st Sess. (1977) 338–40, U.S.Code Cong. & Admin. News 1978, p. 5787.

This court believes that the debtor's use of cash collateral covered by Citytrust's lien to acquire new collateral of equal or greater value while paying interest at the agreed upon rate of 3% over prime will not detrimentally affect Citytrust as long as the value of the collateral used in the turnover process does not decline and no item is sold for less than the cost of acquisition. Such use will be consistent with the rehabilitative opportunity afforded a business under Chapter 11 while protecting the interests of the secured creditor. However, as previously noted, this determination relates exclusively to the debtor's right to use cash collateral in the operation of its business, subject to the limitations imposed, and is independent of the issues to be considered with respect to the hearing that is imminent concerning Citytrust's request for relief from the automatic stay under Code § 362.

It should also be noted that the relief afforded the debtor may be ephemeral in that the proceeds available for the acquisition of new inventory are limited to those

arising out of the sale of existing inventory. The amended financing agreement between the parties expired by its own terms on October 31, 1980. Accordingly, Citytrust is under no obligation to furnish additional inventory financing. Indeed, even if the agreement were still in effect the debtor would not be able to obtain additional involuntary financing from Citytrust, even if it could satisfy the conditions imposed under Code § 365(b)(1) because the trustee is expressly forbidden under Code § 365(c)(2) to assume an executory contract with respect to loans or debt financing when:

"(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor."

Hence, even if the debtor is able to stave off foreclosure, it will have to obtain additional financing from other sources if it is to generate sufficient profits to effect a successful reorganization.

## CONCLUSIONS OF LAW

1. The debtor's application to use cash collateral pursuant to Code § 363(c)(2) is granted upon the following conditions:

a. The debtor shall segregate and account for any cash collateral in its possession or control that is subject to Citytrust's lien.

b. The proceeds from the sale of inventory may be used by the debtor to purchase new inventory from the same manufacturer, with Citytrust's security interest continued in the new inventory.

c. The debtor shall not sell any item of inventory including automobiles, below the debtor's invoiced cost for such item.

d. The debtor shall pay to Citytrust interest at the rate of 3% over Citytrust's current prime rate for the use of such cash collateral.

e. The debtor shall not withdraw from the segregated account any funds other than those used for acquiring new inventory, or interest payments to Citytrust, except that the debtor may withdraw its profit from the resale of an item of collateral only after costs, expenses of the sale and the required interest are paid.

f. If an automobile remains in stock more than seven months, the debtor may not withdraw any profits from the segregated account until the invoiced cost of the vehicle is remitted to Citytrust pursuant to its lien or, at Citytrust's option, the vehicle is turned over to Citytrust in reduction of its lien to the extent of its invoiced cost.

2. Citytrust's application to deny the debtor the right to use the cash collateral that is subject to its lien, is denied except as above restricted.

SUBMIT ORDER ON NOTICE.