## In re THOMAS PARKER ENTERPRISES, INC. d/b/a Chinetti International Motors, Debtor.

### Bankruptcy No. 205-5-90-00895.

United States Bankruptcy Court, D. Connecticut.

April 30, 1981.

Slavitt, Connery & Vardamis, Norwalk, Conn., for Debtor.

Ronai, Berchem & Moses, P. C., Milford, Conn., for Citytrust.

HOWARD SCHWARTZBERG, Bankruptcy Judge.*

Citytrust Corporation, a secured creditor, seeks relief from the automatic stay under Code § 362 so that it might exercise its secured rights with respect to all of the debtor's property collateralizing its loan. The debtor is an automobile dealer engaged in the business of selling Ferrari, Saab and Alfa Romeo automobiles in Greenwich, Connecticut. Citytrust is a banking corporation organized under the laws of the State of Connecticut, with its principal office in Bridgeport, Connecticut, and is the major financier of the debtor's automobile inventory.

The debtor had previously applied for use of cash collateral under Code § 362(c)(2) which this court permitted under certain prescribed conditions, including that Citytrust receive a replacement lien on new inventory to be acquired as a result of the debtor's use of the proceeds from the sale of existing secured automobiles, together with interest at 3% over prime. Vehicles in stock for more than seven months or their invoiced cost had to be turned over to Citytrust before the debtor could withdraw any profits. See *In re Thomas Parker Enterprises, Inc.*, 7 B.C.D. 94, 8 B.R. 207 (Bkrtcy. Conn.1981). Thereafter, Citytrust sought relief from the automatic stay with respect

to the eighteen automobiles securing its loan. After a full hearing, this court ruled from the bench on February 3, 1981, that since Citytrust sought relief from the automatic stay with respect to the vehicles only, and since the court previously held that Citytrust was adequately protected by the replacement lien on new vehicles in accordance with the formula set out in the decision on January 16, 1981, Citytrust's application to lift the stay as to the eighteen automobiles was denied.

Now Citytrust has commenced this adversary proceeding seeking relief from the automatic stay with respect to all collateral in which Citytrust has a security interest.

FINDINGS OF FACT

1. The debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 1101 et seq. on December 4, 1980. The first seven Findings of Fact in this court's decision dated January 16, 1981 with respect to the financial history regarding these parties are incorporated herein and need not be repeated for the sake of brevity.

2. This court's order dated February 23, 1981, recites that as of January 28, 1981, the debtor owed Citytrust $527,873.13, with interest accruing at the rate of prime plus three per cent and that Citytrust was secured by sixteen vehicles with a total collateral value of $387,092.

3. As of April 2, 1981, the loan balance owed to Citytrust was $502,447.14. Additionally, Citytrust was entitled under its loan agreement to charge the debtor for its collection costs, which then amounted to $61,023.76, for a total indebtedness of $563,470.90. Thereafter on April 16, 1981, the debtor sold a Ferrari, Serial # 32595 for $47,915 which had been financed by Citytrust. The debtor then paid Citytrust the required curtailment charge of $4,654.71 reducing the outstanding claimed balance to $558,816.19.

* U.S.B.J., Southern District of New York, sitting by designation of the Chief Judge, United States Court of Appeals, Second Circuit.

4. The value of the secured automobiles financed by Citytrust, based upon 100% of the wholesale invoiced price advanced by Citytrust was $309,606.08. There should be deducted from this figure the automobile previously sold out of trust by the debtor (the so-called Mandell car), valued at $41,440, and the invoiced cost of the subsequently sold Ferrari, serial # 32595, leaving a total value for the secured automobiles on hand of $224,726. Additionally, the segregated account maintained by the debtor pursuant to this court's cash collateral order amounts to $131,020. Thus, the car collateral securing Citytrust's debt of $558,816.10 totals $355,746.

5. It is mathematically correct to conclude that apart from any other collateral, the difference between Citytrust's claimed debt of $558,816.19 and the $355,746 value of its car collateral amounts to a deficiency of $203,070.10.

6. The debtor's operations in the three months of January, February and March, 1981 reveal a loss of $5800, a loss of $14,645 and a profit of $5467 for a net loss of $14,978, independent of the accrued interest on the Citytrust debt of three per cent over prime.

7. The debtor's parts inventory is also included under Citytrust's lien, which is subject, however, to a first lien held by Luigi Chinetti Motors, Inc., the debtor's predecessor in interest. The Chinetti senior lien, dated December 12, 1977, is claimed under a purchase money note in the principal amount of $186,000, together with interest, totalling in excess of $220,000. The debtor argues that this lien can be settled for $115,000, but there was no evidence of any such settlement or that the debtor has the funds to pay the suggested $115,000. The debtor carried the parts inventory on its books for $404,754 as of December 21, 1980. The debtor claims an increment for the increase in the cost of parts, so as to arrive at a figure of $423,855.00. However, the debtor's parts manager testified that the inventory was worth approximately $293,000 and that in today's market it would be difficult to get fifty cents on the dollar in liquidation. This point was also confirmed by the debtor's own witness, Felix Ginorio, III, director of marketing for Union Chelsea National Bank, one of the debtor's prospective financiers. Mr. Ginorio testified that based on his knowledge of foreign car parts, as a former parts manager for International Motors, the liquidation of the debtor's parts inventory would realize approximately 10 cents on the dollar. He valued the inventory at approximately $50,000 for purposes of his financial projections in the structuring of a possible loan to the debtor. In the light of the Chinetti senior lien on the debtor's inventory, Citytrust cannot be regarded as having any equity in, nor can it derive any comfort from, its junior position with respect to the debtor's parts inventory.

8. Confronted with a deficiency of $203,070.19 between the Citytrust obligation and the value of the car collateral, the debtor points to the fact that consideration should be given to the debtor's accounts receivable, reflected on its books at $97,035. However, the debtor's president testified that the receivables totalled approximately $90,000 and that about 80 per cent were collectible. The accountant from Price Waterhouse, who inspected the debtor's records for Citytrust, found that the outstanding receivables actually totalled $72,000 and that this figure included $58,810 of receivables that were more than 120 days in arrears. Surely, unlike old wine, old receivables do not improve with age. Indeed, none of these receivables have been collected this year, although counsel has been retained for this purpose. To the extent that any funds are collected, after allowing for collection expenses, the balance will first be applied to Chinetti's senior purchase money lien, since it includes receivables as well as parts. Accordingly, little or no value can be ascribed to Citytrust pursuant to its junior lien.

9. The debtor's leasehold interest in the building housing its automobile business is cited as additional collateral available to Citytrust under its lien. As in the case of inventory, parts and fixtures, Citytrust's lien is junior to the Chinetti purchase mon-

ey lien of approximately $220,000. There is no question that this leasehold interest is of considerable value to the debtor; the question is to what extent is it of value to a creditor as collateral in the event of liquidation? The area in which the debtor is located in Greenwich, Connecticut, is commercially desirable and accessible to the main highways. The building is in good condition. The upper floor could be converted to 7,000 square feet of office space, provided that the entire lower level is then used to afford adequate parking, as required under local ordinances. One of the debtor's witnesses testified that his valuation of the leasehold interest was based on a conversion to the highest and best use for the premises and that the debtor's use for an auto dealership was not the highest and best use. Thus, assuming a conversion to the highest and best use, and assuming the terms of the lease allow such conversion and that zoning permits are obtainable, the leasehold value would then be $553,333, according to the debtor's witness. He believed that the leasehold was worth $450,000 on an "as is" basis. This witness, was somewhat biased, since he and the debtor's president were socially friendly. He was not fully aware of the restrictions in the lease that required the landlord's prior consent to changes in use of the premises or prior approval as to physical alterations of the premises.

Indeed, paragraph # 2 of the December 30, 1977 lease in question, specifically provides in part: "Tenant shall use and occupy demised premises for new and used car sales and service *and for no other purpose.*" [Emphasis added]. Paragraph # 3 of the lease provides in part: "Tenant shall make no changes in or to the demised premises of any nature *without Landlord's prior written consent.*" [Emphasis added]. As to one-half of the leased premises, the landlord expressly agreed in paragraph # 48 of the rider annexed to the lease that: "Notwithstanding the provisions of "11" of the printed form [dealing with assignments and subletting] the landlord will not unreasonably withhold its consent to the subletting of up to one-half (½), measured by the floor space, of the premises hereby leased to the tenant herein."

Citytrust's expert witness valued the leasehold interest on an "as is" basis and concluded that it was worth $42,000. This was arrived at by concluding that the estimated market value of the fee simple estate is $761,000, from which was subtracted the estimated fee interest of $719,000. This valuation does not take into consideration the specific factors that a purchaser of the leasehold would be willing to pay the debtor, as tenant, for the right to take over the lease according to its terms.

The debtor's own witness conceded that the debtor's use was not the highest and best use and that the landlord could get more for the premises if used for another purpose. However, it cannot be assumed that the landlord will readily consent to a sublease and a conversion of the premises to another use by any subtenant who might wish to take over Citytrust's interest following a foreclosure. In the circumstances, while the prospects for the realization of greater rent may be brighter for the landlord, and while the debtor might be regarded as enjoying a bargain at its current rent level, it does not appear that either factor will enhance Citytrust's position in the event of liquidation, especially since the Chinetti purchase money lien is senior to Citytrust's interest in the leasehold. Hence, Citytrust has shown that the terms of the lease and the existence of the superior Chinetti lien combine to eliminate the possibility of establishing any realizable equity for it in the debtor's leasehold interest in the event of a forced liquidation.

10. Citytrust is also entitled to receive as additional collateral the removal of a $75,000 limitation in Thomas Parker's [the debtor's president] pledge of his limited partnership interest in the event of the dissolution of Caulkin's Citrus Company, Ltd., a Florida orange grove. Apart from Mr. Parker's self-serving testimony, there was no proof that Citytrust can realize any value on liquidation of this interest unless and until after the partnership is dissolved. Since a dissolution of the partnership is a condition precedent to Citytrust's right to

receive any proceeds from this collateral, this asset can hardly be regarded as meaningful within the context of adequate protection with respect to the $203,070.10 deficiency.

11. Citytrust has also been offered as additional collateral a second mortgage on the interest of the debtor's president, Thomas Parker, in a fee interest in the main parcel of two lots in Greenwich, Connecticut which do not now exist separate and apart from one another. The main parcel contains a twelve room house and a swimming pool. Mr. Parker's interest is subject to his mother's life estate. She presently resides in the house. The adjacent parcel contains a carriage house that once served as a garage for the main house. If the main parcel is to be divided from the adjacent parcel, not only will a variance be required from local town authorities, but a new driveway will have to be constructed to service the cottage, since it is necessary to traverse the main parcel to get to the cottage. The debtor's real estate witness, who was also socially friendly with Thomas Parker, originally valued the main parcel at $305,000 and later increased the figure to $340,000. However, the principal balance of the first mortgage is $45,000. There are two other creditors' attachments filed against Mr. Parker's interest in this house in the amount of approximately $60,000. After deducting $105,000, the total of the junior mortgage and the attachments, the remaining $235,000 must be adjusted for the value of the present life estate and the cost to subdivide the two parcels assuming that subdivision is permitted. Thus, using the debtor's own figures, it cannot be concluded that a second mortgage on Thomas Parker's interest in the main parcel of real estate in question will constitute adequate protection in the context of the $203,070.19 deficiency between Citytrust's debt and the value of the debtor's business collateral.

12. There is no doubt that the debtor requires its business collateral if it is ever going to consummate a reorganization. Without the automobiles, parts inventory and fixtures, it will not be able to continue in business. In this connection, there are several problems in addition to the poor first quarter of the year earnings which appear to detract from the debtor's hopes for improved conditions in the future. Saab Scania, one of the debtor's two franchisors, has filed a complaint for relief from the automatic stay under Code § 362. Moreover, the debtor has not received delivery of a new Ferrari since late last year, notwithstanding that orders have been placed with Ferrari. The debtor has been able to acquire some new Ferraris for sale on a consignment basis from other dealers. There therefore appears to be a threat to the continuance of the supply of Ferraris and Saabs, which does not bode well for the debtor's business prospects.

13. It is evident that the debtor can expect to continue to survive only if it is able to come up with new financing which will take over Citytrust's position. The debtor has been aware of this point since it filed its petition for relief last December and has made every effort to obtain outside financing. The debtor had engaged a former bank president to canvas his various contacts with financial institutions who might be willing to advance funds to the debtor.

14. The debtor introduced the testimony of an accountant for a former Mercedes Benz franchisee in Iran who said that his client might be interested in purchasing a $350,000 interest in the debtor and personally finance the debtor's automobile inventory. However, his client left this country for England and is not expected to return before the conclusion of this adversary proceeding. Manifestly, this testimony cannot be treated as anything more than a passing attention. There is no evidence that any financing is either likely or probable from this source.

15. One of the friends of the debtor's president testified that he was a financial consultant and that he had a client who was willing to floorplan five Saabs and Alfa Romeos up to $55,000. Although there was no further evidence as to the identity of the client or his ability to perform, it is clear

that this offer alone, even if likely, will not approach the Citytrust claim in excess of $563,470.90. However, the debtor contends that this financing would be supplemental to the possibility of a $750,000 advance sought from the Union Chelsea National Bank.

16. Felix Ginorio, III, the Marketing Director of the Union Chelsea National Bank, testified that his bank was reviewing the possibility of providing floorplan financing to the debtor at 85% of dealer cost [compared with Citytrust's 100% of dealer cost], up to $750,000, on condition that Mr. Thomas Parker puts $250,000 of additional capital into the business. The interest to be charged for this financing would be at 4 per cent over prime [as compared with Citytrust's 3 per cent over prime]. Mr. Ginorio explained that 4 per cent over prime was justified because it would be a "high risk" loan. The proposal had been submitted to the bank's finance committee and its lawyers for their consideration. In his letter to the debtor, dated March 20, 1981, Mr. Ginorio said that "I expect to take it to Committee for approval within the next two or three weeks." It is now more than one month since Mr. Ginorio's letter. If the Union Chelsea review is to be regarded as more than just a passing interest that caught the attention of one of their salesmen and thereafter went the way of many discarded proposals, it would certainly behoove the debtor to bring to the court's attention that the bank has approved the loan. Other than this possibility [if it still exists], there is no other source of outside financing for the debtor at this time of any proven substance sufficient to find that there is a likelihood of an effective reorganization.

## DISCUSSION

The ground rules applicable to stays in Chapter 11 cases are expressly delineated under Code § 362(d), which provides that a secured creditor is entitled to relief from the automatic stay for cause, including the lack of adequate protection, or in the alternative, where the debtor lacks equity in the

property and it is not necessary to an effective reorganization. The burden of proof is spelled out under Code § 362(g), where the secured creditor must prove the debtor's lack of equity in the property while the debtor has the burden of proof on all other issues.

One of the key factors in determining the issue of equity or its absence with respect to the debtor's automobile inventory is ascertaining the standard to be applied in valuing the automobiles which were financed by Citytrust at 100% of the debtor's cost. The debtor cites In re Spilsbury, 5 B.R. 578, 2 C.B.C.2d 925 (Bkrtcy.Nev.1980) in connection with the proper standard of forecast to be applied in Chapter 11 cases and then goes on to arrive at a value based upon the retail prices at which the vehicles in question are to be sold. Included in the cases cited by the court in Spilsbury, supra, is this court's decision in In re Creed Brothers, Inc., 14 C.B.C. 426 (B.C.S.D.N.Y.1977), in which it was noted that consideration should be given to the going concern value and not the liquidation value. Going concern value does not mean that in eschewing liquidation value one must rely upon retail prices rather than wholesale prices. Surely an institutional financier of automobiles at 100% of the wholesale cost should be entitled to rely upon the wholesale prices of the vehicles since the secured creditor is not in the business of retailing the vehicles and is not expected to derive full retail value upon foreclosure. In re Adams, 2 B.R. 313, 5 B.C.D. 1234 (Bkrtcy.M.D.Fla.1980); In re Crockett, 3 B.R. 365 (Bkrtcy.N.D.Ill.1980). In ruling with respect to the debtor's right to use cash collateral, this court has already stated that the automobiles should be valued at their wholesale prices since Citytrust would not liquidate the automobiles at retail. In re Thomas Parker Enterprises, Inc., 8 B.R. 207, 7 B.C.D. 94 (Bkrtcy.Conn.1981).

█ Applying the criterion of wholesale value, and crediting the debtor for 100% of the wholesale prices, without making any deduction for the cost of liquidating all the collateral, this court finds that the debtor lacks equity in the collateral secur-

ing its indebtedness to Citytrust. On the other hand, the debtor failed to sustain its burden of proof under Code § 362(g)(2) on all the other issues with respect to opposing relief from the automatic stay. Significantly, the debtor was unable to establish that there existed a reasonable possibility of a successful reorganization. The fact that the property in question is indispensable to the debtor's survival does not mean that it is essential to an "effective" reorganization. There must also exist a reasonable possibility of a successful reorganization. *In re Clark Technical Associates, Ltd.*, 9 B.R. 738 (Bkrtcy.Conn.1981); *In re Riviera Inn of Wallingford, Inc.*, 7 B.R. 725 (Bkrtcy.Conn.1980); *In re Terra Mar Associates*, 3 B.R. 462, 6 B.C.D. 150, (Bkrtcy. Conn.1980). As this court stated in *In re Clark Technical Associates Ltd.*, supra, at page 740:

"If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely, it cannot be said that the property is necessary to an 'effective' reorganization."

In this case the debtor produced a bank representative who had submitted the debtor's request for financing at 85% of the wholesale cost of the automobiles, and at an interest rate of 4% over the prime rate. Whether the bank was authorized to do business in Connecticut and whether its finance committee would approve the loan were matters which were left open, although a determination should have been made by the bank, according to its representative's testimony, prior to this date. The other prospective "angels" who testified in behalf of the debtor offered no credible evidence from which a determination could be made that a reorganization in the near future was likely. Essentially, what the debtor really seeks is an indefinite stay in the hope that it will eventually obtain outside financing. This expectation was rejected in *In re Jacobsen J–J Ranch, Inc.*, 4 B.C.D. 245 at 244 (B.C.M.D.Fla.1978), where the court stated that a stay based solely on the hope that things will change

for the better borders on bad faith and should not be rewarded by the court in the exercise of principles of equity. Along the same lines, this court stated in *In re Gaslight Village, Inc.*, 6 B.R. 871 (Bkrtcy.Conn. 1981) as follows: (page 874)

"Indeed, the automatic stay was intended to give the debtor a breathing spell from its creditors and an opportunity to structure a repayment or reorganization plan. See House Report No. 95–595, 95th Cong., 1st Sess. (1977) 340–2, U.S. Code Cong. & Admin. News, 1978, p. 5787; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 49–51, U.S. Code Cong. & Admin. News 1978, p. 5787. The stay was not intended to be permanent."

The debtor did not sustain his burden of proving that Citytrust's secured interest was adequately protected. In certain instances the property alone may provide a sufficient cushion for a secured creditor so as to justify a continuance of the status quo. *In re Rogers Development Corp.*, 2 B.R. 679, 5 B.C.D. 1392 (Bkrtcy.E.D.Va. 1980); *In re San Clemente Estates*, 5 B.R. 605, 6 B.C.D. 838 (Bkrtcy.S.D.Cal.1980). See also, *In re Riviera Inn of Wallingford, Inc.*, supra. However, there was no equity or cushion in the business collateral sufficient to afford adequate protection for Citytrust. The nonbusiness collateral to which Citytrust could look consists of a second mortgage on a portion of an undivided parcel of property, subject to a first mortgage, two attachment liens and a life estate held by the mother of the debtor's president, who resides in the house on the property, together with a pledge of his right to receive proceeds upon liquidation of an existing limited partnership involving a Florida citrus grove. The equity in these interests, which were subject to various conditional limitations, was valued as being less than Citytrust's deficiency claim, which is in excess of $203,000. Certainly, the second mortgage and the pledge of the dissolution proceeds from the citrus grove, when added to the secured business collateral, cannot be regarded as "completely compensatory" and "the indubitable equiva-

**790**

lence" of Citytrust's right "to get [its] money or at least the property" within the meaning of those terms, as expressed by Judge Learned Hand in *In re Murel Holding Co.*, 75 F.2d 941, 942 (2d Cir. 1935).

Citytrust's claim of $558,816.19 continues to mount because the interest rate alone, at 3% over prime, is sufficient to expand the deficiency in excess of the value of the collateral. The debtor's loss in operations during the first quarter of this year further darkens the financial picture. The debtor cannot meet its operating costs. Without an assurance of new automobile deliveries the debtor can only sink deeper into its financial morass, while liquidating its remaining inventory. Indeed, some of its sales reflect prices below cost.

In the circumstances, Citytrust cannot be further deprived of its right to relief from the automatic stay.

### CONCLUSIONS OF LAW

1. The debtor has not sustained its burden of proving that it furnished Citytrust with adequate protection for its secured interest, as required under Code § 362(d)(1).

2. Citytrust has sustained its burden of proving that the debtor lacks equity in the property securing Citytrust's claim, as required under Code § 362(d)(2)(A).

3. The debtor has failed to sustain its burden of proving that the secured property is necessary to an "effective" reorganization within the meaning of Code § 362(d)(2)(B).

4. Citytrust is entitled to an order lifting the automatic stay and to the relief requested in the complaint.

SUBMIT ORDER on five (5) days' notice to the debtor's counsel.