In re EFCOR, INC., Debtor.

EFCOR, INC., Movant,

v.

BANCAMERICA COMMERCIAL
CORPORATION and Gould,
Inc., Respondents.

Bankruptcy No. 5–87–00018.

United States Bankruptcy Court,
M.D. Pennsylvania.

June 4, 1987.

As Amended July 29, 1987.

Doran & Nowalis, John H. Doran, Robert C. Nowalis, Wilkes-Barre, Pa., for debtor.

Blank, Rome, Comisky & McCauley, Alan Gershenson, Diane J. Sigmund, Philadelphia, Pa., and O'Malley, Harris & Schneider, Myles Wren, Scranton, Pa., for BancAmerica Commercial Corp.

Wolf, Block, Schorr & Solis-Cohen, Michael L. Temin, Philadelphia, Pa., for Dov Grossman.

## MEMORANDUM AND ORDER

THOMAS C. GIBBONS, Bankruptcy Judge:

On January 15, 1987, debtor herein, Efcor, Inc., filed a voluntary petition under Chapter 11 of the Bankruptcy Code. One week later, debtor filed a Motion under 11 U.S.C. § 363 for Authority to Use Cash Collateral seeking the right to use all of the proceeds of its inventory and accounts receivable in the ordinary course of business.

The critical facts underlying the Motion under consideration are not seriously disputed. On April 1, 1983, Dov Grossman, purchased all the stock of the debtor. Previously he had purchased the stock of three other companies in related businesses: Atlas Technologies, Inc., Blackhawk Industries, Inc., and Allen-Stevens Conduit Fittings Corporation. At the time of the purchase of debtor's stock a financial relationship was established with BancAmerica Commercial Corporation (hereinafter "BACC"). Certain documents were executed between the parties, most important of which was the Loan and Security Agreement which provided for a discretionary revolving line of credit based upon percentages of eligible accounts receivable and inventory. Each of the aforementioned companies whose stock was owned by Grossman had individual lenders with appropriate security interests in its borrowers' assets.

In early 1985 BACC told the debtor, Efcor, that it wanted Efcor to find a new source of financing to replace it. On September 8, 1986, BACC sent debtor a written sixty (60) day notice of termination of the Loan and Security Agreement. Debtor requested additional time to find a replacement lender and on November 7, 1986, debtor, Grossman and BACC entered into an agreement which, among other things, extended the termination of BACC's financing until January 15, 1987. At this time debtor owed BACC approximately $7.7 Million.

Following prolonged negotiations beginning on April 2, 1987 an agreement was reached between the parties (Efcor, Grossman, BACC and Gould, Inc., a junior secured creditor) as to the terms of a cash collateral order to be submitted to the Court. On February 2, 1987, this Court signed the order agreed to by the parties regarding cash collateral.

*Inter alia,* the cash collateral order provided that for thirty (30) days the debtor could use all cash coming into a pre-existing lock box arrangement (with one exception of a required interest payment). After the 30 day period expired, however, debtor could only use cash collateral to the extent that the sum of (1) 50% of the eligible inventory and (2) 80% of the eligible receivables exceeded $6,116,179.00. "Eligibility"

was to be defined by looking to the Loan and Security Agreement and amendments thereto, with only such modifications as were specified in the Cash Collateral Order.

Testimony adduced at the evidentiary hearing on debtor's Motion established that BACC's consent to the foregoing arrangement was based on the representation (1) that debtor and Grossman would not be "out of formula" by more than $200,000 during the first 30 days. (2) In this connection a $200,000 non-recourse mortgage on property owned by Grossman in Scranton, Pennsylvania, would be given as additional collateral to cover this contingency. It was represented that the said Scranton property was subject to two liens. One was a mortgage of $400,000 to the City of Scranton; the other a mortgage of approximately $30,000 to one of debtor's suppliers. (3) Additionally, debtor promised to provide considerably more current and complete information and certain specified daily and weekly reports. Testimony later showed that a judgment lien in the amount of $533,000 was held by the United Penn Bank on the Scranton property. Clearly, this lien was not disclosed to BACC during the negotiations for its consent to a cash collateral order and in order of priority preceded the mortgage which Grossman was to give BACC under its terms. (No explanation for this fact has ever been disclosed).

The cash collateral order entered upon the agreement of all parties to this proceeding required reports to be made to the debtor by BACC. Soon after the initial reports were received BACC maintained that the debtor was "out of formula" by considerably more than the sum it had been anticipating of $200,000. It argued that debtor's own submissions as of 2/15/87 were out of formula by $315,308 according to debtor's Exhibit # 2.

A later report of 2/24/87 reported to show that the debtor was then within $25,760 of the agreed formula by recording purchases from affiliates' lenders in the amount of $709,215 during the week ending 2/21/87. The record showed that of the sum of $709,215 of inventory purchased from its affiliates by the debtor during the week ending 2/21/87, $281,009 represented raw material and $282,886 represented work-in-process. These purchases, principally from its affiliate Atlas, were received when the debtor was no longer manufacturing, but contracting out all of its manufacturing to the same Atlas facility.

Following the receipt of the report from the debtor for the week ending 2/21/87 showing the $709,215 in purchases from affiliates, BACC advised debtor by a letter of 3/3/87 (BACC Exhibit # 10) that it did not consider the inventory purchased from affiliates as eligible unless the debtor supplied written consent to the sale free of the security interest from the selling affiliate's lender. The consent requested by BACC was not forthcoming. Moreover, debtor gave BACC nothing whatever to assure BACC that it now had a first priority secured interest in inventory purchased from affiliates and ahead of any security interest which debtor's affiliates' lenders might have.

As a consequence to the foregoing BACC considered the inventory purchased from affiliates as ineligible. This resulted in a substantial insufficiency at all times after 30 days after the entry of the cash collateral order. Thereafter, 31 days following the consent collateral order BACC flatly refused to advance any of the cash coming into the lock box in receivables to the debtor.

Debtor then filed the Motion under consideration to modify the consent collateral order contending that BACC had improperly refused to consider inventory purchased from affiliates as eligible and requested:

1. BACC be ordered to turnover all funds which had been deposited in the lock box;

2. The cash collateral order be modified to eliminate the lock box arrangement; and

3. That the debtor be allowed to collect accounts receivable directly from its customers.

BACC filed a Reply and Cross-Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d) alleging that its ac-

tions were entirely proper and requested relief from the automatic stay on the ground that:

 1. The debtor had no equity in its assets in excess of the secured debt to BACC and others;

 2. That there is no possibility that the debtor could reorganize; and

 3. BACC's collateral was at risk because among other things debtor was not paying its employees and other debts and may be intermingling assets with its affiliates none of which are involved in these bankruptcy proceedings.

The foregoing facts as previously indicated are virtually uncontested (except for the interpretation to be placed upon affiliates' purchases) and indeed consist largely of records submitted to the respondent, BACC by the debtor. They follow the recital in the respondent's Memorandum and are amply substantiated in the transcripts of these proceedings.

## DISCUSSION

■ Debtor's position throughout these proceedings has been that BACC and other secured lenders have always been aware that the longstanding regular business practice of debtor was to purchase a substantial amount of its inventory from its affiliates. Consequently, it urges that BACC had acknowledged inventory thus purchased as eligible inventory. Debtor does not dispute the amount of the debt claimed by BACC and others nor does it challenge the records offered by BACC in support of its positions. We have for determination then a narrow legal question raised by the debtor that:

"A continued course of dealings between debtor and a secured party evidencing the secured party's acquiescence in transfers of collateral constitute authorization by the secured party of such transfers and entitles the transferee to take free of the security interest."

Debtor maintains the security interest continues in collateral notwithstanding the disposition thereof "unless the disposition was authorized by the secured party in the Security Agreement or otherwise." The phrase "or otherwise" debtor argues indicates the disposition of collateral may be authorized by other then expressed language in the Security Agreement. Further, debtor argues that the Third Circuit Court of Appeals has held that under Pennsylvania law and other jurisdictions the acquiescence in the sale of collateral by a secured party constituted a waiver of the security interest. *U.S. v. Walter Dunlap & Sons*, 800 F.2d 1232 (3rd Cir.1986). Here the debtor argues all secured creditors have also been aware that the debtor regularly purchased inventory from its affiliates and that these secured creditors have also permitted such purchases without objection. It appears that the difficulty with debtor's position on this important issue is that although there admittedly has been a course of conduct in the past, this does not deprive BACC of the right to request (as it did) proof of the acquiescence of affiliates' lenders in accordance with its Security and Loan Agreement. Clearly, the consent collateral order does not vitiate its terms nor does it in any way affect the rights acquired thereunder by BACC. [Indeed by its express terms it provides as follows on page 1: "... (which inventory and receivables meet the eligibility standards contained in the Loan and Security Agreement dated April 1, 1983 and all related agreements and amendments thereto between BACC and debtor (Prepetition Agreements)]. Not only did debtor fail to supply the written consent to the sale in question free of the security interest of the selling affiliate's lender, it failed to acknowledge receipt of the request. Additionally, there is no suggestion in the record that the affiliate's lender was ever apprised of the request and obviously was not invited to attend the hearings on this Motion. The key question then becomes whether or not there was such acquiescence in the sale of collateral by the affiliate's lender as to constitute a waiver of its secured interest. We think that it has not. BACC on the other hand argues that debtor has not established the right to have inventory which was transferred to it by non-bankrupt affiliates treated as eligible collateral for purposes of calculating the line of credit to be

made available under provisions of and a formula set forth in loan documents and a cash collateral order. In support of this position BACC directs attention to the Loan and Security Agreement. *Inter alia,* it provides that:

"BACC is always to have a first priority security interest in all collateral [Sections 1.1(*o*) and 3.3]. It also provides that debtor will do whatever BACC may reasonably request to create and maintain a valid and enforceable first lien upon the property which debtor pledges as collateral for BACC to lend against. [Section 1.1(p)]. It further provides that 'Acceptable Raw Material Inventory', 'Acceptable Work in Progress Inventory', and 'Acceptable Finished Goods Inventory' are what BACC may 'in its sole discretion' agree to define as such. (Section 2.4)."

The unusual size of the $709,215 transfer of inventory to debtor from its affiliates in one week caused BACC to question whether it would have a valid first lien on such materials. Accordingly, as previously indicated it requested debtor to show consent to the transfers from the affiliates' lenders. It was never submitted. The record shows that most of the inventory in question was transferred to the debtor from the affiliate Atlas whose secured lender was Citicorp. BACC recognized that under U.C.C. Sections 9–306 and 9–307 Citicorp's security interest in the inventory continued notwithstanding the transfer to the debtor unless:

a) Citicorp authorized the transfer; or

b) Debtor is determined to be a buyer from Atlas in the ordinary course of business.

Debtor, of course, contends that it was in fact a buyer of the inventory from Atlas in the ordinary course of business. If so, debtor has failed to establish this fact and curiously refused to even recognize BACC's request for proof of Citicorp's consent to the transfer free of its security interest.

Moreover, debtor also has the burden of showing that BACC has a first priority security interest. Obviously to accomplish this, debtor would be required to show that Atlas' lender (Citicorp) had somehow lost its security interest in the inventory transferred to the debtor. BACC's position on this issue is unassailable, i.e., that under the Loan and Security Agreement it (BACC) has the right to insist that debtor take all reasonable steps to give BACC comfort that it has a first lien on the inventory transferred from Atlas and other affiliates. [Section 1.1(p) of the Loan and Security Agreement]. Debtor's failure to prove that it was a "buyer in due course" clearly disqualified the transferred inventory as "eligible" collateral. This unquestionably resulted in a significant insufficiency as required by the Loan and Security Agreement and the consent collateral Order which is the subject of this proceeding.

Debtor's Motion to modify the cash collateral Order is accordingly denied.

## CROSS MOTION

In addition to the Reply of BancAmerica Commercial Corporation (BACC) to debtor's Motion to modify the Order regarding cash collateral, Respondent has also filed a Cross-Motion for Relief from Automatic Stay pursuant to 11 U.S.C. 362(d).

The facts outlined in the earlier portion of this Memorandum are adequate for our consideration of the Cross Motion and need not be repeated here.

## DISCUSSION

The automatic stay imposed by § 362 of the Code is subject to termination or modification by the court for grounds set forth in subsection (d) as follows:

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization."

BACC alleges two grounds for relief from the automatic stay, to wit, (1) lack of adequate protection of its interest in the property, and, alternatively, (2) that the defendant debtor has no equity in the property and no reasonable prospect for reorganization. BACC also maintains that the cumulative actions of the debtor in obtaining previous stays of the execution sale constitute "cause" for relief from the stay within the meaning of § 362(d)(1) of the Code.

Under § 362(d) the automatic stay may be terminated, annulled, modified or conditioned for *either* of the two reasons set forth in subsection (d), as evidenced by use of the disjunctive phraseology of (d)(1) and (d)(2). *In re Family Investments, Inc. d/b/a Octaves*, 7 B.C.D. 194, 8 B.R. 572 (W.D.Ky.1981); *In re Ruark*, 7 B.R. 46 (D.Conn.1980). See *In re Lake Tahoe Land Co., Inc.*, 5 B.R. 34 (D.Nev.1980).

"Adequate protection" as used in the new Bankruptcy Code was derived from the language in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935), where it is said at page 942:

"It is plain that 'adequate protection' must be completely compensatory; ... a creditor ... wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders unless by a substitute of the most indubitable equivalance."

*In re Lake Tahoe Land Co., Inc., supra*, at 36.

■ Although the term is not precisely defined, § 361 of the Code sets forth three (3) nonexclusive examples of what may constitute "adequate protection" of an interest in property:

(1) periodic cash payments to the extent that the stay results in a decrease in the value of such interest;

(2) an additional or replacement lien to the same extent, or

(3) other relief as will result in the realization of the indubitable equivalent of such interest.

None of these has been offered. Instead debtor contends that there is a substantial equity cushion which provides adequate protection for BACC's interest in the property. An equity "cushion" in and of itself may constitute adequate protection within the meaning of § 362(d)(1). 2 *Collier on Bankruptcy*, 361.02(3) at p. 361–9 (15th ed. 1979). *In re Pitts*, 5 B.C. 1129, 2 B.R. 476 (Cal.1979).

■ In seeking relief from automatic stay, the creditor has the burden of proof on the issue of the debtor's equity in the collateral, but the debtor has the burden of all other issues including adequate protection of the creditor. 11 U.S.C. § 362(g); *In re San Clemente Estates*, 5 B.R. 605 (Cal. 1980).

A fair reading of the record shows that the debtor (respondent herein) maintains that the transfers previously discussed in the earlier part of this Memorandum were proper in all respects and thus, BACC is adequately protected. Since we have concluded for various reasons that this is not so, we will not go into any lengthy discussion of that issue except to reiterate that the debtor violated the consent cash collateral order and utterly failed to comply with the terms of the underlying agreements, to wit: the Loan and Security Agreements and all amendments and extensions thereof.

Debtor's other defense in this connection as indicated by Mr. Grossman's testimony is that at the time BACC stopped remitting cash payments, debtor had accumulated backorders in the amount of $2,474,138.32. Further, that debtor's reporting to BACC after the entry of the cash collateral order had improved greatly and this was acknowledged by BACC's loan officer, Mr. Attix. A curious footnote in this regard is that throughout the history of this relationship (prior to the cash collateral order) adequacy of records has always been a troublesome factor. Notwithstanding the improvement in the latter stages of this relationship between the parties in reporting,

Mr. Grossman acknowledges that he was unable to obtain certified audited statements from his accountants because they could not afford to pay the expense incident thereto.

Despite the improvements in reporting procedure immediately following the entry of the cash collateral order, however, BACC's representatives encountered greater difficulty following debtor's filing of its Motion for modification of the cash collateral Order. An auditor for BACC, Mr. Kubinak, assigned together with other members of the audit staff for the financial and collateral accounts of the debtor, encountered greater difficulty after the first court hearing in this matter. His primary responsibility was for on-site verification of the figures which were generated in the weekly reports that debtor was filing under the collateral order. In the East Farmingdale location, he would verify accounts receivable and cash disbursements. In the Scranton locations, he would examine the bills of lading and shipping documentation and the material flow reports. At East Farmingdale, Mr. Grossman advised him that he would not be able to have access to the accounts receivable records. The stated reason was that none of the employees in the building were on debtor's payroll and instead being paid out of other sources. Specifically, their job was to continue the reporting functions for the other affiliate companies in Scranton. He visited the Atlas facility and the neighboring Taylor Distribution Center. In the former, he was trying to gain access to records dealing with inventory reports and material issue reports which would be concerned with the material flow between Atlas and the debtor.

At the latter, he was primarily concerned with gaining access to shipping records and bills of lading. At Atlas, he talked to a Mr. Symanski, the chief operations officer for all four affiliate companies, a person whom he understood to be an individual able to identify inventory from the various affiliates. Mr. Symanski advised him that he was not able to give him access to records. Supposedly, there were no debtor's employees available to produce any documentation

for him to examine. In conversation, Mr. Symanski advised him that the transfer of the material between Atlas and the debtor, which occupied much attention during these hearings, had "not been officially booked and that there was no audit trail to trace that transfer." Further, that material in certain areas not booked to the debtor remained the property of Atlas. This served to reinforce BACC's position that it was without adequate protection for its collateral and conversely made it difficult for debtor to claim any equity in the same.

Finally, debtor's witness' testimony was that its machinery, equipment, specific property, plant furniture and office furniture have the following values:

| | |
|---|---|
| Value in Use | $7,216,990 |
| Orderly Sale Value and | $4,601,035 |
| Forced Sale Value | $2,694,070 |

BACC's valuation testimony is as follows:

| | |
|---|---|
| Machinery and Equipment | $1.0 Million |
| Inventory | |
| a) Finished Goods | $2.5 Million |
| b) Raw Material and Work-in-Progress | $0.5 Million |
| Accounts Receivable | $0.5 Million |
| Cash | $0.6 Million |

Debtor acknowledges that the principal debt, exclusive of attorney's fees and expenses owed to BACC is $7.8 Million. Together with other secured debts, the total exceeds $10 Million.

■ To sustain its burden of showing of proof that the secured property is necessary for an effective "reorganization", debtor must establish that there is at least some reasonable chance of reorganization. 2 *Collier on Bankruptcy*, ¶ 362.07[2], [3] (15th 15th ed.). While there has been testimony submitted that some of the affiliates of debtor are readily saleable, the conclusion that this debtor can be successfully reorganized by no means follows. Indeed, the thrust of the testimony offered in this regard was directed more toward an orderly liquidation of the debtor than an effective reorganization.

The valuation testimony of both sides was offered by representatives of reputa-

ble appraisal companies. Debtor's witness, one Joseph J. Mickle of the firm of Marshall & Stevens, testified from a report representing a summary of work supervised by him. His conclusions gave three different values: (1) Value In Use, (2) Orderly Liquidation, and (3) Forced Liquidation of debtor's machinery and equipment.

In Scranton, he indicated that the machinery and equipment represented a value in use of $3,722,500. This represented a value attributed by him when a business would be purchased with the machines already installed; an orderly liquidation value of $2,697,580; and a forced liquidation value of $1,627,700. An additional valuation of categories other than machinery and equipment termed special properties was also offered by the debtor. This represented a value in use of $1,509,000; an orderly liquidation value of $528,000 and a forced liquidation of $262,000.

In East Farmingdale, New York, the machinery and equipment value in use was $131,500 with an orderly liquidation value of $92,050 and a forced liquidation value of $55,250. Additionally, plant furniture and equipment of $39,175 for value in use with an orderly liquidation value of $27,420 and a forced liquidation value of $16,450. At West Winfield, Oklahoma, machinery and equipment value in use was $1,388,550 with an orderly liquidation value of $1,025,000 and a forced liquidation value of $623,050. Special properties at this location were represented to have a value in use of $250,000, an orderly liquidation value of $120,000 and $60,000 as a forced liquidation value.

Mr. Mickle also testified that there were three other facilities valued on the basis of records supplied to his firm without any physical inspection.

The witness' testimony that the assignment of a value in use to particular machinery and equipment assumed that the entire property would be sold. That is to say, without subdividing the sale of debtor's assets as opposed to any of its affiliates. It was a value of component parts of an entire location. When questioned about the debtor's ability to sell a particular facility in its entirety, however, including affiliates' assets, he was unable to state how readily such a sale could be accomplished. His answer was that machinery and equipment could be sold "in place" if you sold all three companies. His appraisal he said was done as a complete operation.

The net result of the witness' testimony was a tremendous amount of uncertainty as to the precise ownership of machinery and equipment. Notwithstanding the fact that the appraisal was done in a highly professional manner, this fact alone presents serious questions as to its effect on these proceedings. An illustration of this is evidenced in the following questions of debtor's appraisal by his own counsel:

"Q. Is there anything you have to clarify the issue as far as the values are concerned that you have ascribed to EFCOR by location?

A. Yes. The only thing I wanted to clarify a little bit in relationship to the question that was asked was we did the appraisal of the EFCOR family of companies, which you have of Atlas Technologies, Allen-Stevens.

So when we compiled our recapitulation of value, we did a typical company within location breakdown. So off the top of my head I wouldn't know what EFCOR was in total dollar value because we did not do the appraisal based on company.

We were told to break the equipment down by company, but we did it at each location. So when I was asked the question basically what is EFCOR worth, whether it be one million or two million dollars or whatever, without going back and calculating that I couldn't answer.

Q. But, of course, it's in the appraisal, and you did respond to those question in direct examination earlier?

A. Yes."

The valuation testimony of BACC was presented by a highly competent and unusually experienced appraiser. Equipped with the information obtained in an earlier appraisal of 1985 and an update in 1986, the witness offered a very persuasive view of the values of debtor's machinery and

equipment, inventory, work in progress, accounts receivable and cash on hand. His judgment was predicated on percentages of stated book values supplied by the debtor to BACC, together with the conclusions reached in 1986 when his company re-evaluated the machinery and equipment of the debtor. His testimony indicated that an orderly liquidation of debtor's machinery and equipment would reflect a gross amount of $1,200,000. He concluded further that an orderly liquidation basis relative to the book values of the inventory given to him would show a 54% figure. His testimony reflected employment of a highly sophisticated analysis based on years of experience in similar situations. He acknowledged that the debtor had a good name in the industry for many, many years and asserted that while liquidation value is sometimes inappropriate it would not be in this case because there would be no technological obsolescence as a result of plant closure. Consequently, it was his opinion that the 54% applied to book value was very reliable. He did suggest that there was a possibility that notwithstanding the good name debtor had in the industry the value of the inventory might suffer to the extent of 4% because of the economic climate. As to the valuation of raw material and work in progress, his testimony indicated that it could range from 15% to 25% of stated book value. He admitted in this connection that the 15% figure was used rather than 25% because the latter was achieved in sales in California. There, he testified, there was a ready market in a large metropolitan area where such items would be more saleable.

On balance it must be concluded that BACC's testimony is much more credible for the reasons described and consequently, more persuasive in final analysis. It represents conclusions, reached in debtor's records of stated book value, subjected to the test of the witness' experience. While it relies heavily on an orderly liquidation concept, there can be little doubt that at present, at least, this seems to be what the debtor is contemplating.

■ Based on the testimony presented, although mention has been made of the possibility of the sale of affiliates and re-financing of the debtor itself, the more plausible likelihood is that the debtor intends to effect an orderly liquidation. In view of the wide disparity between the appraisals offered, it would be highly improper to allow this to happen. Debtor acknowledges a debt of almost $8 Million to BACC. BACC's appraisal on the other hand fixes debtor's assets at $5.1 Million. Its appraisal is far more credible, and as previously indicated, more persuasive. It is forthright and does not contain any ambiguities or uncertainties, unlike that of the debtor.

As BACC has argued there is simply no basis for the debtor to retain control of any orderly liquidation when in reality it is liquidating BACC's collateral and BACC wishes to regain its right to possession and sale.

To summarize then it has been clearly established that the debtor has no equity in any of the properties subject to BACC's security interests. Likewise, debtor has failed to meet its burden that the property is necessary to an effective reorganization because of the inescapable conclusions of its Chief Executive Officer's testimony that an orderly liquidation of the properties is intended. Thus, BACC has met its burden under § 362(d)(2). Although the foregoing is legally sufficient to grant the relief requested by BACC, it is the Court's opinion that debtor has failed to offer adequate protection of BACC as required by § 362(d)(1).

■ Finally, debtor argues that BACC should be denied relief from the automatic stay pursuant to § 362(d)(2), because § 362(d)(2) applies only to acts against real property not to acts against personal property. *Riggs National Bank of Washington v. Perry* (In re Perry), 729 F.2d 982 (4th Cir.1984). It appears that debtor's interpretation of *Riggs* is overly broad. A better interpretation is found in the dissenting opinion of *Riggs* wherein it is stated that the dissenting judge did not agree "... with the majority opinion ... as it *implies* that relief is not required by

§ 362(d)(2) to personal property when the debtor loses his equity in the secured property." *Id.* at 987. Surely, use of the word implies means that the majority did not squarely state that § 362(d)(2) is inapplicable to personal property. Section 362(d)(2) is explicit on this point:

"... the court shall grant relief from the stay ... such as by terminating, annulling, modifying or conditioning such stay ... with respect to an act against property ... if the debtor does not have an equity in such property." *Id.* at 987 citing § 362(d)(2)(A)

The Legislative History U.S.Code Cong. and Admin.News 1978, 5787 on page 5790 is just as certain:

"The automatic stay by its nature seriously affects the rights of *all* the debtor's creditors...." (emphasis added). *Id.* at 987.

It is true, as stated in *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bankr. E.D.N.Y.1980) that the legislative history of § 362(d)(2) uses real property as an example to show when relief from the stay is warranted. "However, the language of the statute is not so limited, and should be read as applying to all property which is encumbered by a creditor's interest...." *Id.* at 356. The plain language of § 362(d)(2) indicates that it applies to property under § 362(a). Section 362(a) refers to property of the estate which includes all legal or equitable interests of the debtor as of the commencement of the case. 11 U.S.C. § 362(a); 11 U.S.C. § 541. Thus, debtor's argument that § 362(d)(2) does not apply to personal property is without merit.

This memorandum constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### ORDER

AND NOW, at Wilkes-Barre, this 4th day of June, 1987, upon consideration of the Cross-Motion filed by BancAmerica Commercial Corporation ("BACC") for Relief from the Automatic Stay, and after hearing thereon and for good cause shown, it is hereby

ORDERED AND DECREED that the Automatic Stay under § 362(a) is terminated as to BACC with respect to all accounts (bank or otherwise), accounts receivable, inventory, contract rights, machinery, equipment, general intangibles, furniture, fixtures, documents, instruments and chattel paper, and all products and proceeds thereof (hereinafter, jointly and severally, the "Collateral") of the Debtor; and it is further

ORDERED AND DECREED that the Debtor forthwith surrender all of the Collateral to BACC, allow BACC to take immediate possession of all of the Collateral, and fully cooperate with BACC to accomplish such repossession by BACC, its agents, and/or its employees, and granting leave to BACC to sell and/or otherwise dispose of the Collateral pursuant to all agreements between BACC and the Debtor, the Uniform Commercial Code, and all other applicable agreements and principles of law and equity; and further

ORDERED that the clerk of the court shall file this document as the judgment of the court.